[No. 61930-1. En Banc. August 24, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. JOHN PAUL MIERZ, *Petitioner*.

462

*Williams, Kastner & Gibbs*, by *David H. Smith* and *Daniel W. Ferm*, for petitioner.

*Norm Maleng, Prosecuting Attorney*, and *Francis D. Zavatsky, Deputy*, for respondent.

TALMADGE, J. — The present case arises out of John Paul Mierz's unlawful possession of two coyotes and his assault upon Department of Wildlife agents (Wildlife agents) who entered his yard without a warrant to seize the coyotes. On rather convoluted facts, we must decide a number of issues, but the most preying is whether a person confronted with allegedly unreasonable search or seizure may assault law enforcement officers and then rely on the exclusionary rule to foreclose admission of evidence pertaining to the assaultive behavior. Because exclusion of the evidence of violent behavior would only license attacks upon law enforcement officers performing their duty, we uphold the Court of Appeals' decision affirming Mierz's convictions for assault and unlawful possession of wildlife.

## ISSUES

1. Did Mierz waive any error relating to evidence illegally gathered?

2. Did the agreement to try the case on stipulated facts violate Mierz's rights under CrR 4.2?

3. Did the trial court improperly deprive Mierz of the claim of self-defense?

4. Did Mierz receive ineffective assistance of counsel?

5. Was Mierz improperly charged with and convicted of third-degree assault under RCW 9A.36.031(1)(g)?

6. Was Mierz's conviction for possession of wildlife proper under RCW 77.08.010(16) and RCW 77.16.040 if the coyotes were domesticated?

## FACTS

In 1989, Mierz found two coyote puppies. He took them home and kept them with his dogs in his back yard, which was enclosed by a six-foot chain-link fence.

Upon learning that State law requires a permit to collect, transport or possess wildlife (see RCW 77.16.040; RCW 77.32.010), Mierz requested a scientific permit from the Department of Wildlife (Department), stating he would display the coyotes to the public.[1] Subsequently, about twenty persons viewed the coyotes in Mierz's yard. In late 1990, the Department denied Mierz's permit application, finding that Mierz unlawfully kept wildlife. Mierz appealed the decision. Subsequent to the events in this case, the Director of the Department denied Mierz's appeal, noting his lack of training, and his failure to obtain a permit before collecting the coyotes. Clerk's Papers at 194, 201. Mierz apparently did not seek review of the Director's decision.

In late 1990, Mierz also announced on local television that he would put the coyotes in "sanctuary" on the Yakama Indian Reservation to avoid their confiscation by the Department. Agent Michael Krenz viewed the television program on which Mierz made his announcement. Another agent, James Suda, lived in Mierz's neighborhood, and could see the coyotes when he drove by Mierz's

---

[1]RCW 77.32.010(2)(b) requires a permit for collection of wildlife for research or display.

home. After the television program, Krenz and Suda did not see the coyotes in Mierz's yard again until spring of 1991.

Believing Mierz to unlawfully possess the coyotes, Krenz and Suda set out on July 16, 1991, to take the coyotes. They were accompanied by a wildlife rehabilitation specialist experienced in handling coyotes, who could help them cage and take the coyotes to a licensed wildlife rehabilitation center.[2]

At his door, the Wildlife agents asked Mierz if he had a permit. He did not, but invited them in to see a Departmental letter permitting him to keep the coyotes and to telephone the Department in Olympia to verify that he had been told he could keep the coyotes while his appeal was pending. The agents found the letter was from Mierz's attorney, and could not reach any Department contact to verify Mierz's claim. Mierz then told them to leave the property, which they did.

From a neighbor's yard, the agents again told Mierz they did not need a warrant and again asked for his help in caging the coyotes, who were running loose in the yard with the two dogs. Mierz pretended to help by catching the coyotes, but started to put them in the house. Krenz told Mierz to put them in the kennel. Mierz did so, but locked the gate and threw away the key.

Krenz then came over the fence into the yard, with Suda close behind. As the agents came in, Mierz yelled "attack them, attack them, attack them." Clerk's Papers at 173. The larger dog, a Husky mix, bit Suda on the leg and drew blood. Krenz took Mierz by the arm and tried to arrest him for obstructing an officer; Mierz went "berserk." Clerk's Papers at 168. Mierz continued to yell and struggle while Krenz peeled his fingers from the fence, and brought him to the ground. King County Police and

---

[2]The Wildlife agents did not obtain a warrant because they allegedly were told by a judge and prosecutor at the Aukeen District Court that a warrant was unnecessary as the coyotes were in "plain view." Clerk's Papers at 18; *State v. Mierz*, 72 Wn. App. 783, 786-87, 866 P.2d 65, 875 P.2d 1228 (1994).

Washington State Patrol officers arrived to assist. When Krenz tried to put Mierz in a car, Mierz bit Krenz on his hand. Suda went to the hospital. Another agent and the wildlife specialist took the coyotes to the wildlife center.

Mierz was thereafter charged with unlawful possession of wildlife and two counts of third degree assault under RCW 9A.36.031(1)(g). Before trial, Mierz's lawyer[3] indicated he would seek suppression of illegally obtained evidence, but never filed a motion to suppress. He also stated that Mierz asserted "self-defense," Clerk's Papers at 12, 20, but made it clear that Mierz relied only upon defense of his property, i.e., the coyotes, and not self-defense against bodily harm:[4]

> THE COURT: As I understand it, your defense to the two assault counts is predicated on the fact that he was defending property [i.e., the coyotes] that he was entitled to believe was his own, correct?
>
> Is there any other defense that you're raising in regard to those two assault counts?
>
> MR. DANKO: No, outside of the force used was reasonable.

Report of Proceedings at 41.

The State moved in limine to bar any opening statement or argument supporting Mierz's claim of self-defense. The trial court found that Mierz had no right to defend the coyotes because he had no right to possess them, and

---

[3]Mierz's appellate counsel was not his counsel at trial.

[4]Mierz's theory was "color of title," i.e., that he had a legal right to protect the coyotes because he thought he could keep them while appealing the Department's denial of his request for a permit. Mierz's counsel stated that "[a]ll of Mr. Mierz's actions were intended to defend his property . . . . [He] asserts his self-defense claim based upon a good faith claim of title, i.e., possessory rights [in the coyotes] pursuant to his administrative law claim. Mierz had a legal right to possess and to protect the animals." Clerk's Papers at 40-42. *See also* Report of Proceedings at 5 (defense is "color of title" and "possessionary interest" in coyotes); 6 ("We're talking about one's protection of one's property"); 8 ("[Mierz's] resistance constitutes 'self-defense', i.e., the protection of property"); 9-10 (counsel concedes court had facts needed to decide applicability of "color of title" defense).

barred the argument that Mierz was entitled to use "self-defense" *to protect the coyotes.*[5] The court also barred mention during voir dire or opening argument that Mierz considered the arrest illegal, reserving its ruling on that issue.

A jury was impaneled, but after the wildlife specialist testified to the events at Mierz's home, Mierz's trial counsel informed the court that because of the court's pretrial rulings, Mierz wished to have a stipulated facts trial. The trial court verified on the record that Mierz understood that the court, not a jury, would determine the facts, and the State's findings of fact and conclusions of law were acceptable to Mierz. Report of Proceedings at 97-105. Mierz waived the right to a jury in writing. Clerk's Papers at 65; Report of Proceedings at 102.

The facts to which Mierz, his trial counsel and the State stipulated were that (1) on July 16, 1991, Mierz had two animals identified as coyotes in his yard in Renton, King County; (2) that he lacked any permit; (3) that his appeal of the Department's denial of his request for a permit was pending; (4) that Mierz did not want the agents to remove the animals, and after "appearing to cooperate" with the agents, he padlocked the animals in a pen; (5) the agents responded by entering his backyard, Suda heard Mierz shouting, "attack, attack," and was bitten by one of Mierz's dogs, and Krenz was bitten by Mierz while subduing him; and (6) that the agents took custody of Mierz and removed the animals. Clerk's Papers at 211.

In an abundance of caution, the trial court decided to review independent information on the question of Mierz's guilt. Report of Proceedings at 103. Counsel stipulated to the admission into evidence of copies of the Department's decision, statements of the agents, other law enforcement officers and the wildlife specialist, and

---

[5]Report of Proceedings at 55-58. The court's minute entry states: "State's motion to bar argument by defendant to the jury re: self-defense (arising from protection of property) . . . the Court finds color of title argument is not applicable to the defense of property claim; therefore, the State's motion to bar defendant from using self-defense argument is granted." Clerk's Papers at 50-51.

medical records of Suda's injury. Report of Proceedings at 103-05. After a recess to review the information, the trial court found Mierz guilty of one count of unlawful possession of wildlife and two counts of third degree assault. Report of Proceedings at 106-07.

Mierz subsequently obtained new counsel and moved for a new trial and to modify the findings. The trial court denied the motion for a new trial, but entered slight modifications of the findings. The Court of Appeals affirmed Mierz's convictions in *State v. Mierz*, 72 Wn. App. 783, 866 P.2d 65, 875 P.2d 1228 (1994). We affirm the decision of the Court of Appeals.

## DISCUSSION

### 1. Waiver of Error on Admission of Evidence

■ Mierz did not move below to suppress evidence he claims was illegally obtained as a result of the Wildlife agents' warrantless entry upon his property. He raised this issue for the first time on appeal. *Mierz*, 72 Wn. App. at 789. Mierz's failure to move to suppress evidence he contends was illegally gathered constitutes a waiver of any error associated with the admission of the evidence and the trial court properly considered the evidence. *Mierz*, 72 Wn. App. at 789.

### 2. Trial on Stipulated Facts

Mierz next contends that he was deprived of due process when he was tried on stipulated facts without the protections afforded to those who plead guilty. CrR 4.2. He also argues that he never submitted a written waiver of his right to trial by jury. CrR 6.1. Both contentions lack merit.

First, the record plainly discloses that Mierz signed a written waiver of a jury trial. Clerk's Papers at 65.

■ ■ Second, there was a true stipulated facts trial here as the trial court independently reviewed the evi-

dence and made its own .findings of fact. In *State v. Johnson*, 104 Wn.2d 338, 705 P.2d 773 (1985), we ruled that a stipulated facts trial is different from a guilty plea. A guilty plea obviates need for a trial. A stipulated facts trial is still a trial of the defendant's guilt or innocence. In a stipulated facts trial, the right to appeal is not lost. The burden of proof remains upon the State, and the defendant may offer evidence and cross-examine the State's witnesses. "[B]y the stipulation, [the defendant merely] agrees that what the State presents is what the witnesses would say." *Johnson*, 104 Wn.2d at 342. Because of these differences, the safeguards for guilty pleas under CrR 4.2 are not required in a stipulated facts trial.

The Court of Appeals found that the procedure here was a stipulated facts trial under *Johnson* because Mierz agreed to have the trial court decide the facts and the issue of guilt or innocence based upon stipulated evidence, and the court independently assessed the evidence and found Mierz guilty. *Mierz*, 72 Wn. App. at 795. We agree. The trial court specifically requested evidence supporting the proposed findings of fact and conclusions of law. The trial court received such evidence in the form of the Department's findings of fact in denying Mierz's permit appeal, and statements of several law enforcement officers as well as the civilian wildlife specialist. The trial court assessed this evidence and, based upon this evidence, found Mierz guilty as charged.

The fact that Mierz agreed to findings of fact prepared by the prosecutor after an adverse ruling is not problematic. In *State v. Wiley*, 26 Wn. App. 422, 426, 613 P.2d 549, *review denied*, 94 Wn.2d 1014 (1980), the court upheld a stipulated facts trial where the defendant lost a suppression motion and then stipulated to facts outlined by the prosecutor.

Mierz's trial counsel, however, stipulated to conclusions of law that Mierz was guilty. This was not appropriate for a stipulated facts trial. Any error, however, was cured by the trial court's independent assessment of the facts. The

trial court asked for and considered independent evidence such as the statements of agents, the State Patrol and King County Police reports, medical records, and the wildlife specialist's testimony. In *State v. Jacobson*, 33 Wn. App. 529, 656 P.2d 1103 (1982), *review denied*, 99 Wn.2d 1010 (1983), the court upheld a stipulated facts trial where defense counsel made broad statements concerning guilt", because "the trial court did not treat the defendant's stipulation as a guilty plea" and the court "considered the police reports and statements before entering findings of fact and conclusions of law. This substantially distinguishes this case from the entry of a guilty plea." *Jacobson*, 33 Wn. App. at 534. Accordingly, the procedure here was a stipulated facts trial and CrR 4.2 was not implicated.

### 3. Motion in Limine on Self-Defense

Mierz asserts that the trial court erred in granting the State's motion in limine to foreclose argument on self-defense. Pet. for Review at 11-12. The record is clear that the only self-defense argument asserted below was *defense of the coyotes*.

█ At trial, Mierz's counsel assured the trial court and the State that Mierz's self-defense contention was only that Mierz was defending coyotes he thought he was entitled to possess, not that he was in fear of harm and defending his person.[6] The State's motion in limine and the court's ruling and order *only concerned defense of property*. Report of Proceedings at 55-58; Clerk's Papers at 51. The trial court did not bar Mierz from arguing or proving self-defense of his person. RCW 9A.16.020(3). Nor did the court bar Mierz from offering proof as to defense of property. As Mierz was not in lawful possession of the coyotes, he had no right to invoke RCW 9A.16.020(3) for defense of

---

[6]See nn. 4 and 5.

property. The trial court did not err in granting the State's motion.

4. Ineffective Assistance of Counsel

██ ██ Mierz contends that he did not receive effective assistance of counsel guaranteed in the federal and state constitutions. U.S. Const. amend. VI; Const. art. I, § 22 (amend. X). *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In *Strickland*, the Court established a two-part test for ineffective assistance of counsel. First, the defendant must show deficient performance. In this assessment, the appellate court will indulge in a strong presumption that the defendant was properly represented. *State v. Lord*, 117 Wn.2d 829, 883, 822 P.2d 177 (1991), *cert. denied*, 113 S. Ct. 164 (1992); *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987); *Strickland*, 466 U.S. at 688-89. Deficient performance is not shown by matters that go to trial strategy or tactics. *State v. Garrett*, 124 Wn.2d 504, 520, 881 P.2d 185 (1994); *State v. Mak*, 105 Wn.2d 692, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986). Second, the defendant must show prejudice — "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. This showing is made when there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different. *Thomas*, 109 Wn.2d at 226. If either part of the test is not satisfied, the inquiry need go no further. *Lord*, 117 Wn.2d at 894; *State v. Fredrick*, 45 Wn. App. 916, 729 P.2d 56 (1986). Mierz does not meet the *Strickland* test as he has not shown prejudice.

a. Effect of Failure To Suppress Allegedly Illegal Evidence

Mierz claims that his attorney's failure to move to suppress the evidence obtained by the Wildlife agents' entry into the yard constitutes ineffective assistance of counsel. We disagree.

Mierz argues that because "[a]ll the evidence used to

convict [him of assault] arose out of the unlawful and violent entry of the agents into his home and their violent assault upon his person," the exclusionary rule would have barred admission of such evidence. Pet. for Review at 13.[7] The Court of Appeals stated in dictum that a Fourth Amendment violation was present because the officers had no statutory authority to make a warrantless arrest, the padlocked, fenced-in back yard was a constitutionally protected "curtilage" and the entry was not justified by any exception to the warrant requirement. *Mierz*, 72 Wn. App. at 790-93.[8]

We do not need to decide whether Mierz's backyard coyote run was a constitutionally protected curtilage. Nor do we find it necessary to decide whether an exception to the Fourth Amendment warrant requirement applies.[9]

---

[7]There is no question of Fourth Amendment protection as to Mierz's illegal possession of the coyotes. Mierz has not challenged the court's findings that he possessed coyotes on July 16, 1991, without a permit.

[8]Without expressing a view on the analysis by the Court of Appeals on the scope of Fourth Amendment protection of curtilage, we note that a Fourth Amendment analysis of curtilage centers on whether the person has a reasonable expectation of privacy as to the place in question. *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); *United States v. Dunn*, 480 U.S. 294, 301, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987). *See also State v. Niedergang*, 43 Wn. App. 656, 660, 719 P.2d 576 (1987); *State v. Ridgway*, 57 Wn. App. 915, 917-19, 790 P.2d 1263 (1990) (area by door of hidden rural house part of curtilage); *State v. Solberg*, 122 Wn.2d 688, 696-701, 861 P.2d 460 (1993) (no expectation of privacy in porch area open and visible to the public).

Moreover, we note that the Court of Appeals erroneously stated in its opinion at 792-93 that the Wildlife agents had no authority to arrest Mierz without a warrant. In fact, Wildlife agents have statutory authority to make warrantless searches, seizures, and arrest under certain circumstances. *See* RCW 77.12.101 (warrantless seizures of wildlife on probable cause); RCW 77.12.080 (warrantless arrests); RCW 77.12.090 (warrantless searches). RCW 77.12.095 authorizes warrantless inspections of places where wildlife is kept by permit. This State power over wildlife is extensive, albeit subject to constitutional provisions. *Cook v. State*, 192 Wash. 602, 607-08, 74 P.2d 199 (1937).

[9]Such exceptions include *exigent circumstances, State v. Terrovona*, 105 Wn.2d 632, 644, 716 P.2d 295 (1986); a defendant's *implied consent to a warrantless search* by entering into a line of business subject to "a full arsenal of governmental regulation" that precludes any reasonable expectation of privacy in the premises or the stock of the business, *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313, 98 S. Ct. 1816, 56 L. Ed. 2d 305 (1978); *United States v. Biswell*, 406 U.S. 311, 316, 92 S. Ct. 1593, 1596, 32 L. Ed. 2d 87 (1972) (upholding warrantless seizure of shotguns); *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 74,

Similarly, we do not reach a state constitutional argument.[10]

Instead, we agree with the Court of Appeals that the evidence of Mierz's assaultive behavior was properly admitted regardless of any alleged Fourth Amendment violation under the facts of this case. This view is consistent with the rule first articulated in *State v. Hoffman*, 116 Wn.2d 51, 804 P.2d 577 (1991), where a defendant shot a law enforcement officer in the back, and claimed a constitutional defect invalidated the officer's right to be on the property. The defendant claimed that he could not be convicted of aggravated first degree murder under RCW 10.95.020(1) because the officer was not engaged in "official duties." The *Hoffman* court determined that even an officer effecting an arrest without probable cause "may still be engaged in 'official duties', provided the officer is not on a frolic of his or her own, and the officer is entitled to be protected by the law from assault." *Hoffman*, 116 Wn.2d at 100. This court adopted a liberal view of "official duties" in *Hoffman* for purposes of charging a person with a crime. We see no reason to adopt a restrictive view of "official duties" in deciding whether to apply the exclusionary rule to Mierz's assaultive behavior.

Officers would be subject to attack if their allegedly unlawful entry onto property or improper arrest forecloses admission of evidence of assaults upon them. In *State v. Aydelotte*, 35 Wn. App. 125, 132, 665 P.2d 443 (1983), the Court of Appeals held that an assault against police officers following an illegal entry is outside the scope of the

90 S. Ct. 774, 777, 25 L. Ed. 2d 60 (1970) (seizure of liquor); *Lesser v. Espy*, 34 F.3d 1301 (7th Cir. 1994) (warrantless search of regulated rabbitry); and the *open conduct of an illegal business, State v. Hasting*, 119 Wn.2d 229, 232, 830 P.2d 658 (1992).

[10]We do not decide whether the agents' conduct violated the privacy guaranty in article I, section 7 of the Washington Constitution ("[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law"), because Mierz provides no analysis and cites to no authority concerning that issue. *See State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986). The failure to engage in a *Gunwall* analysis in timely fashion precludes us from entertaining a state constitutional claim. *State v. Clark*, 124 Wn.2d 90, 95, 875 P.2d 613 (1994).

exclusionary rule, because it is sufficiently distinguishable from any initial police illegality "to be purged of the primary taint" (quoting *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)). The court agreed that excluding such evidence would allow one whose home has been illegally entered to "respond with unlimited force and, under the exclusionary rule, . . . be effectively immunized from criminal responsibility." *Aydelotte*, 35 Wn. App. at 132 (quoting *State v. Burger*, 55 Or. App. 712, 716, 639 P.2d 706, 708 (1982)).

> Even if one assumes the illegality of the entry there is no showing that the evidence sought to be suppressed is an "exploitation" of the primary illegality. There is no simplistic "but for" analysis that applies in this area of the law. *United States v. Bacall*, 443 F.2d 1050, 1057 (9th Cir.[ ), *cert. denied*, 403 U.S. 1004] (1971). These are not cases where the illegal entry leads to the seizure of evidence which produces an admission from a defendant . . . . Nor are they cases where the illegal entry gives an officer knowledge of prior or ongoing criminal activity and hence bars testimony as to such evidence. What is present here is simply an attempt to suppress evidence which is a result of allegedly wilful acts of misconduct by [defendants] whose provocation and perhaps ultimate defense may be found in the fact of the entry itself. The exclusionary rule does not reach that far.

*Commonwealth v. Saia*, 372 Mass. 53, 58, 360 N.E.2d 329, 332 (1977), *quoted in State v. Aydelotte*, 35 Wn. App. 125, 133, 665 P.2d 443 (1983).

Mierz urges us, however, to adopt Division Three's analysis in *State v. Apodaca*, 67 Wn. App. 736, 839 P.2d 352 (1992). There, officers wrongfully, but peaceably, talked their way into an apartment to question the owner of a car involved in an accident. While conversing about the accident, the owner lunged for a dresser drawer containing his loaded gun. Applying the exclusionary rule, the court reversed Apodaca's conviction for attempted assault solely because the evidence of the assault arose following the officer's illegal entry into the residence. We reject this result. The result in *Apodaca* would have been the same

had the citizen reached the gun and shot one of the officers. An identified law enforcement officer who oversteps constitutional bounds, without any threat of deadly harm to a defendant or exploitation of his or her position, should not have to pay the ultimate price. If suppression is proper in *Apodaca* or in Mierz's case, one day we would have to suppress evidence "where an officer is murdered." *Mierz*, 72 Wn. App. at 794.

Any benefit provided by exclusion of evidence in these cases comes at too high a price. Given the complexity and nuance of Fourth Amendment law, in many cases the law enforcement officer and the citizen may both have sincere or reasonable beliefs about the lawfulness of the entry or arrest. Encouraging citizens to test their beliefs through force simply returns us to a system of trial by combat. The proper location for dealing with such issues in a civilized society is in a court of law.

Here, even assuming the entry or arrest were not legal, the evidence of the assault did not arise due to exploitation of any unconstitutional entry or arrest. Mierz's commands to his dogs to attack persons known by him to be law officers was unjustifiable. There was no violence or threat of violence by the Wildlife agents before or at the time they entered the yard and arrested Mierz. They did not draw guns. They announced their purpose, gave Mierz several chances to prove he had permission for the coyotes, several times sought his help in safely caging the coyotes, and in general demonstrated a concern for order and safety. They did not enter the yard to arrest Mierz until he locked up the coyotes and threw away the key.

■ We hold that the evidence of Mierz's assaultive behavior was properly admitted. Even if the entry or arrest by law enforcement officers was unlawful, the exclusionary rule does not foreclose admission of evidence of the assaults where the officers are identified as such, are performing official duties in good faith, and there was no exploitation of any constitutional violation. *Apodaca* is overruled to the extent that it conflicts with this decision.

b. Trial on Stipulated Facts

Mierz also contends that his lawyer's decision to agree to a trial on stipulated facts was ineffective assistance of counsel. We disagree.

A stipulation as to facts may represent a tactical decision which may or may not bear fruit. *E.g., State v. Goodin*, 67 Wn. App. 623, 633, 838 P.2d 135 (1992) (stipulation that the defendant's residence was within 1,000 feet of a school bus stop, allowing for enhancement of the sentence), *review denied*, 121 Wn.2d 1019 (1993); *Wiley*, 26 Wn. App. at 425-26. Under the *Strickland* standard, merely agreeing to a stipulated facts trial in this case was a tactical decision and was not in itself deficient or prejudicial.

c. Self-Defense

Mierz argues that he was provided ineffective assistance of counsel when his counsel failed to prove his commands to his dogs were to protect himself from an unlawful threat to his person. As previously noted, Mierz's argument on the State's motion in limine focused exclusively on his alleged right to use force to defend the coyotes, which were not legally in his possession.

When Mierz attacked the officers with his dogs, he faced no threat of injury other than a loss of freedom. *See* section IV(A). An arrestee charged with assault upon a law enforcement officer must show that there was an imminent threat of serious physical harm in connection with an unlawful arrest in order to establish legitimate use of force in self-defense. RCW 9A.16.020(3); *State v. Hornaday*, 105 Wn.2d 120, 131, 713 P.2d 71 (1986) (use of force to prevent unlawful arrest threatening only a loss of freedom is not reasonable) (quoting *State v. Goree*, 36 Wn. App. 205, 209, 673 P.2d 194 (1983), *review denied*, 101 Wn.2d 1003 (1984)); *State v. Holeman*, 103 Wn.2d 426, 693 P.2d 89 (1985) (threat of serious bodily injury required to justify resistance to arrest); *State v. Crider*, 72 Wn. App. 815, 820, 866 P.2d 75 (1994); *City of Seattle v. Cadigan*, 55 Wn. App. 30, 37, 776 P.2d 727, *review denied*, 113 Wn.2d 1025 (1989); see

*also State v. Rousseau*, 40 Wn.2d 92, 94-95, 241 P.2d 447 (1952) (one may not resist arrest which merely threatens liberty with measures allowed to counter deadly force; force used must be "reasonable and proportioned to the injury attempted"); *cf. State v. Counts*, 99 Wn.2d 54, 61, 659 P.2d 1087 (1983) (arrestee who drew knife on officers who posed no threat of physical harm held entitled to argue self-defense). There was no evidence that Mierz was about to suffer serious physical injury when the agents entered the yard and arrested him. In the absence of such evidence, a self-defense theory fails.[11] *State v. Janes*, 121 Wn.2d 220, 237, 850 P.2d 495 (1993).

Under the *Strickland* standard, we cannot say that Mierz was denied effective assistance of counsel when his trial counsel did not argue self-defense. Mierz initiated the unnecessary violence in this encounter. *Janes*, 121 Wn.2d at 241. He has not offered facts that would demonstrate an imminent threat of serious physical harm.

5. Assault Convictions

Mierz argues that the State was required to charge him under subsection (a) of RCW 9A.36.031(1) rather than subsection (g) because subsection (a) is a special statute, which must be used where both it and a general statute (here, allegedly subsection (g)) encompass the conduct in question. RCW 9A.36.031(1) provides for the crime of assault in the third degree:

(1) A person is guilty of assault in the third degree if he or she . . .:

(a) With intent to prevent or resist the execution of any lawful process or mandate of any court officer or the lawful apprehension or detention of himself [or herself] or another person, assaults another; or

---

[11]Although a defendant is entitled to an instruction on self-defense if any evidence of the threat of serious bodily injury is adduced, *State v. Gogolin*, 45 Wn. App. 640, 727 P.2d 683 (1986), a defendant must show evidence of a threat of serious bodily injury, rather than evidence that the defendant violently resisted an otherwise peaceful arrest.

. . . .

> (g) Assaults a law enforcement officer or other employee of a law enforcement agency who was performing his or her official duties at the time of the assault.

Mierz contends that if he were charged under subsection (a), he would have had the opportunity to more readily argue the lawfulness of the Wildlife agents' actions.[12]

■ Where conduct falls within the scope of two criminal statutes, the accused only may be charged under the more specific (or "special") statute and may not be charged under the more general statute. *State v. Shriner*, 101 Wn.2d 576, 580-81, 681 P.2d 237 (1984). RCW 9A.36.031(1)(a) is not a special statute relative to RCW 9A.36.031(1)(g), because subsection (g) is not violated in each instance where subsection (a) is violated. Indeed, a violation of subsection (a), which plainly could involve private citizens, would not be a violation of subsection (g), which protects only law enforcement officers and employees of law enforcement agencies. *State v. Belleman*, 70 Wn. App. 778, 784, 856 P.2d 403 (1993). Because subsection (a) is not a special statute relative to subsection (g), it was not error for the State to charge Mierz under subsection (g).

■ Mierz also argues that RCW 9A.36.031(1)(g) only may be violated by an assault while an officer of the law is engaged in "official duties" other than an arrest, because

---

[12]The State contends that evidence of self-defense (of one's person) must always be barred in a prosecution under RCW 9A.36.031(1)(g). The State argues that in enacting this subsection in 1989, the Legislature intended to do away with the right of self-defense against an unlawful arrest so long as the officer was "performing his or her official duties." We assume, without deciding, that the Legislature did not intend to drastically limit the right of self-defense in RCW 9A.16.020(3), given Washington's strong policy on self-defense and the use of the term "assault" in subsection (g). Traditionally, self-defense is available in an assault situation. *See, e.g., State v. Gogolin*, 45 Wn. App. 640, 727 P.2d 683 (1986) (entitlement to self-defense instruction where there is "any" evidence tending to support the claim); *State v. McCullum*, 98 Wn.2d 484, 500, 656 P.2d 1064 (1983); *State v. Acosta*, 101 Wn.2d 612, 616, 683 P.2d 1069 (1984) (demonstrating the absence of self-defense is part of the State's burden); *State v. Hornaday*, 105 Wn.2d 120, 131, 713 P.2d 71 (1986) (reasonable, proportional force may be used to defend against illegal arrest threatening serious physical injury).

RCW 9A.36.031(1)(a) covers any arrest situation. Pet. for Review at 9. In *Hoffman*, we determined that the term "official duties" in the aggravated homicide statute encompassed conduct within the scope of the officer's employment, including authority to make an arrest. *Hoffman* is equally persuasive in the context of the thirddegree assault statute.

Mierz also claims that an officer is not performing "official duties" under subsection (g) when making an illegal arrest, citing *State v. Little*, 116 Wn.2d 488, 806 P.2d 749 (1991). Pet. for Review at 11. *Little* does not stand for such a proposition. *Little*, in fact, supports the view that if officers stop a person for investigative purposes, that person's flight from the officer may be punished as the obstruction of a public servant in the performance of duties under RCW 9A.76.020. *Little*, 116 Wn.2d at 496-97.

Mierz presents an overly restrictive definition of the term "official duties." We hold that "official duties" as used in RCW 9A.36.031(1)(g) encompass all aspects of a law enforcement officer's good faith performance of job-related duties, excluding conduct occurring when the officer is on a frolic of his or her own. *Hoffman*, 116 Wn.2d at 99-100. RCW 9A.36.031(1)(g) includes assaults upon law enforcement officers in the course of performing their official duties, even if making an illegal arrest. Mierz was properly charged under RCW 9A.36.031(1)(g).

6. Conviction for Possession of Wildlife

RCW 77.16.040 provides that "it is unlawful to bring into this state, offer for sale, sell, possess, exchange, buy, transport, or ship wildlife . . .".[13] RCW 77.08.010(16) defines wildlife as:

---

[13]Earlier decisions refer to "game" where today's law refers to "wildlife." In 1990, the Legislature retitled the "game" code the "wildlife" code. Laws of 1990, ch. 84, § 1. In 1980, the Legislature substituted the term "wildlife" for "game" in a number of places, without intending a substantive change. RCW 77.04.010, as amended by Laws of 1955, ch. 36, § 77.04.010 and Laws of 1980, ch. 78, §§ 1, 2.

all species of the animal kingdom whose members exist in Washington in a wild state. This includes but is not limited to mammals, birds, reptiles, amphibians, fish, and invertebrates. The term "wildlife" does not include, feral domestic mammals, [old world rats and mice], or . . . food fish or shellfish . . . .

Mierz argues that his "domesticated" coyotes were "feral domestic mammals," and not wildlife, under this definition. This argument suggests that while RCW 77.16.040 bars possession of wild coyotes, there is an exception for Mierz's coyotes because he caught them and took them to his home.

 Statutes are to be construed to effect their purposes, and to avoid an unlikely or strained consequence. *Ski Acres, Inc. v. Kittitas County*, 118 Wn.2d 852, 857, 827 P.2d 1000 (1992). A number of decisions broadly interpret various provisions of the wildlife laws so as to better protect wildlife.[14] Construing "feral domestic mammals" to include any animal reclaimed from the wild would defeat the purpose of the wildlife code to "preserve, protect, and perpetuate wildlife." RCW 77.12.010; *Judd v. Bernard*, 49 Wn.2d 619, 622, 304 P.2d 1046 (1956). We think it more likely, as the Court of Appeals did, that "feral domestic mammals" refers to individual members of domestic species such as cats or dogs that have run away, species which the wildlife code is not intended to protect.[15] *Mierz*, 72 Wn. App. at 799.

Mierz's interpretation would lead to insuperable dif-

---

[14]*Silz v. Hesterberg*, 211 U.S. 31, 53 L. Ed. 75, 29 S. Ct. 10 (1908) (State prohibitions on possession apply to animals lawfully acquired in other states), *quoted in Graves v. Dunlap*, 87 Wash. 648, 657, 152 P. 532 (1915); *State v. Walsh*, 123 Wn.2d 741, 748, 870 P.2d 974 (1994) (defendants were engaged in a "hunt," though no animal was nearby, when they spotlighted and took aim at decoys); *State v. Rhodes*, 58 Wn. App. 913, 919-20, 795 P.2d 724 (1990).

[15]Our construction of "wildlife" to include recaptured wildlife is also mandated by precedent. At common law "all property right in animals *ferae naturae* [wild animals] was in the sovereign for the use and benefit of the people," *Cawsey v. Brickey*, 82 Wash. 653, 656, 144 P. 938 (1914). One who caught and confined a wild animal was entitled to possess the "reclaimed" animal as long as it was confined. *Graves v. Dunlap*, 87 Wash. 648, 652, 152 P. 532 (1915) (quoting 2 Thomas M. Cooley, *Torts* 838 (3d ed. 1906). But the right to

ficulty in enforcing wildlife laws; individual "domesticated" members of a wild species would not be protected and could be possessed or taken with impunity. Wildlife agents would have to test the degree of domestication of a particular animal before concluding that the animal was wildlife. *See Graves v. Dunlap*, 87 Wash. 648, 657, 152 P. 532 (1915) (citing the "difficulty of determining whether a fowl killed and possessed during the closed season had been a reclaimed or wild bird"). This would be absurd. Wildlife agents must treat *all* members of wild species as wild. This is required to make the wildlife laws workable.

Mierz also claims the prohibition upon possession of wildlife as applied to him is unconstitutionally vague under *City of Spokane v. Douglass*, 115 Wn.2d 171, 178, 795 P.2d 693 (1990). We disagree. A person of ordinary intelligence would reasonably understand that taking coyotes from the wild and raising them at home with one's dogs violates a prohibition upon the possession of wildlife. This conclusion is bolstered by consideration of the context and history of our wildlife laws, practical difficulties of Mierz's alternative interpretation, and our history and common experience. *Spokane*, 115 Wn.2d at 180. Ordinary Washingtonians would not doubt that coyotes are wild animals.

In sum, all members of a wild species are wildlife, even if "tamed," and all members of a domestic species are not "wildlife," even if running wild. Just as a leopard cannot change its spots (*Jeremiah* 13:23), Mierz could not convert the coyotes from wild to domestic animals.

## CONCLUSION

The participants in the events of this case permitted a relatively simple problem of possession of coyotes to escalate needlessly into a violent confrontation. Mierz overreacted to the actions of the Wildlife agents who were attempting to do their duty, as they saw it, to protect

reclaim and keep a wild animal was abrogated in 1913 when the fast game code was passed. *Graves*, 87 Wash. at 652-56.

wildlife. The Wildlife agents should have backed off and permitted Mierz to cool down before effecting an arrest, rather than forcing a violent confrontation.

We will not adopt a rule, as Mierz advocates, that permits citizens to claim a right of self-defense against law enforcement officials who are performing their duty in good faith and who do not place citizens in an imminent threat of serious bodily injury. Neither will we apply the exclusionary rule to bar admission of evidence of assaultive behavior against identified law enforcement officers who are performing their official duties and allegedly violate the Fourth Amendment. We will not condone violence against law enforcement officials.

It is a wise course, and the hallmark of our civilization, that the rule of law should prevail over needless confrontation.

The convictions of John Paul Mierz are affirmed.

DURHAM, C.J., DOLLIVER, SMITH, GUY, JOHNSON, MADSEN, and ALEXANDER, JJ., and UTTER, J. Pro Tem., concur.