IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 29641-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALAN D. JENKS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Alan Jenks appeals his conviction of first degree robbery, arguing that the trial court admitted other crimes' evidence in violation of ER 404(b), allowed testimony by a DNA[1] analyst that violated his Sixth Amendment right to confront witnesses, and that he received ineffective assistance of counsel. We find no error or abuse of discretion and affirm.

FACTS AND PROCEDURAL BACKGROUND

On December 9, 2008, a convenience store on Northwest Boulevard in Spokane was robbed. The robber entered the store wearing a bandana to cover his face, a do-rag to cover his hair, and brandished what appeared to be a nine millimeter handgun. He ordered the store clerk, James Berg, to lay down on the floor. Bruce Denend, the manager of the store, was working in the store's office and heard the robber command

---

[1] Deoxyribonucleic acid.

Mr. Berg to lie down. He closed the office door, pulled up and watched what was happening on the video generated by the store's surveillance cameras, and called police. The video captured the robber's actions taking two 18-packs of beer from the store's cooler, cigarettes from behind the counter, and leaving. In leaving the store, the robber passed an entering customer, Tony Krebs.

Mr. Denend followed the robber outside, keeping his distance. He saw the robber take off what appeared to be a maroon sweatshirt before getting in a car and departing.

Officer Scott Campbell soon arrived at the store, reviewed the surveillance tape, and was taken by Mr. Denend to the area where he had seen the robber take off clothing. The officer retrieved a long-sleeved maroon sweatshirt and a white do-rag from the bushes, both of which matched the robber's clothing as captured on the surveillance videotape.

Because Mr. Denend believed he recognized the robber as a former regular customer who had been captured by the video surveillance cameras shoplifting beer a month earlier (on November 8), he retrieved the surveillance footage showing the November 8 shoplifting. He provided that, and surveillance video of the December 9 robbery, to police.

Detective Chester Gilmore was ultimately assigned responsibility to investigate the robbery. With the help of other officers who were familiar with the defendant, Alan Jenks, the detective identified Mr. Jenks as a suspect in the November 8 shoplifting and

2

by extension, the robbery. He made an unsuccessful attempt to contact Mr. Jenks at his home in December but left a business card, and Mr. Jenks contacted the detective thereafter. By the time Mr. Jenks met with the detective in January 2009, he had short hair, unlike the shoplifter and robber captured by the store's surveillance cameras in November and December, both of whom had long hair. But in the course of his interview by Detective Gilmore, Mr. Jenks admitted he was the individual who shoplifted the beer in November. He also acknowledged cutting his hair several weeks before the interview. He denied knowing anything about the December robbery, however.

Spokane police sent the maroon sweatshirt and the do-rag to the Washington State Patrol crime lab for DNA analysis. After the crime lab reported that it had completed wearer profiles from the items, Detective Gilmore returned to Mr. Jenks's home to ask for a DNA sample, and Mr. Jenks voluntarily provided a buccal swab. After all the DNA profiles had been completed, crime lab personnel determined that the white do-rag had DNA from at least three different individuals, with Mr. Jenks a possible contributor. They estimated that one in four individuals would be identified as a possible contributor. They determined that the maroon sweatshirt had DNA from two significant contributors, with Mr. Jenks being a possible significant contributor. They estimated that one in 630,000 people would be identified as a possible contributor.

In October 2009, the State charged Mr. Jenks with first degree robbery.

3

The first trial of the robbery charge took place in October 2010 and resulted in a deadlocked jury and a mistrial. The second trial took place in December 2010. In the two-day trial, the State called as witnesses Detective Gilmore, Officer Campbell, Mr. Berg, Mr. Krebs, Mr. Denend, and Lorraine Heath, a supervising forensic scientist in the DNA section of the state crime lab.

Pursuant to an ER 404(b) ruling on a pretrial motion in limine, the State was permitted at both trials to offer and play the surveillance videotape of Mr. Jenks's presence in the convenience store on November 8 for an identification purpose, although the court ordered that there be no mention that Mr. Jenks's conduct in the videotape was theft or shoplifting.

It was revealed in Lorraine Heath's direct testimony that a former crime lab employee, rather than Ms. Heath, analyzed the reference DNA sample obtained from Mr. Jenks. Ms. Heath testified that when the crime lab was unable to locate the former employee, Ms. Heath performed a new analysis of the do-rag and maroon shirt to prepare the DNA profiles to which she testified at trial.

The jury returned a verdict of guilty and the court sentenced Mr. Jenks to 60 months' confinement. He appeals. While the parties submitted their briefs in October and November 2011, the appeal was stayed pending a decision in *State v. Lui*, 179 Wn.2d 457, 315 P.3d 493 (2014), a confrontation clause case that was expected to address one of the issues raised in the appeal.

4

ANALYSIS

Mr. Jenks assigns error to (1) the court's admitting the November 8 video contrary to ER 404(b), (2) the court's allowing testimony from a DNA analyst other than the analyst who conducted the initial tests in violation of his Sixth Amendment right to confront witnesses, and (3) ineffective representation by his lawyer in failing to object to identification opinion testimony offered by Detective Gilmore and the DNA result testimony by Ms. Harper.[2]

### I. ER 404(b)

Mr. Jenks first argues that the November 8 surveillance video, which captured him shoplifting two 18-packs of beer from the convenience store, was evidence of another crime or wrong that should have been excluded under ER 404(b).[3]

The State moved in limine before Mr. Jenks's first trial for admission of the evidence, arguing in its briefing that the surveillance video was admissible as evidence of

---

[2] Mr. Jenks also assigned error to cumulative error depriving him of his right to a fair trial. Since we find no error or abuse of discretion, the contention of cumulative error clearly fails and we do not address it further.

[3] ER 404(b) provides:

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

motive, opportunity, preparation, plan, knowledge, identity or absence of mistake or accident. By the time the motion was argued, the State focused on the purpose of identification, pointing out that the November 8 video showed Mr. Jenks without any mask or hair covering and provided evidence of his height, his hair length, his dress, his mannerisms and how he carries himself—all within a month of the robbery—that the jury could compare to the December 9 video of the robbery.

The defense responded that there was other evidence of what Mr. Jenks looked like in the robbery timeframe that the jury could compare to the December 9 video. It argued that because shoplifting is another type of theft, the November 8 video would be unduly prejudicial. But it then asked, if the court decided to admit the November 8 video, that no one describe Mr. Jenks as being engaged in a shoplifting. In its reply to the defense argument, the prosecutor stated that "the state would stipulate that it will not address the November 8th incident as a shoplifting." Report of Proceedings (RP) at 208.

In announcing its decision on the in limine motion, the court ruled that the State proved that the November 8 act occurred by a preponderance of the evidence, that the video was admissible for the purpose of establishing Mr. Jenks's identity as the robber, and that its probative value was not outweighed by undue prejudice. Having ruled the video admissible, the court "accept[ed] the state's offer" that there would be no discussion of shoplifting—"merely that the defendant was there, and then show the video, and then he could pick it out, and the jury could make of it what they wish." RP at 213.

6

At the pretrial hearing for the December 2010 trial, the State again indicated its willingness to offer the November 8 video without any mention that it depicted a shoplifting. In response, defense counsel noted that its position at the prior trial had been that the video was not admissible under ER 404(b). But its expressed concern in the December pretrial conference was that there be no testimony that Mr. Jenks was committing shoplifting in the video. Mr. Jenks's lawyer concluded:

> So I would move to exclude that part of [Mr. Jenks's] conversation with Detective Gilmore where they talk about that . . . as being a theft and Mr. Jenks makes admissions of that. It is not necessary to prove any sort of identity.
> If the state wants to prove he has been in the store, they certainly have that videotape. And I would think that certainly does it. *And I kind of ask the Court to adhere to its prior ruling on that.*

RP at 23 (emphasis added).

On appeal, Mr. Jenks argues for the first time[4] that evidence admitted for the purpose of showing identity must amount to evidence of a "modus operandi." Br. of Appellant at 13-14. He argues that here, there are no unique commonalities between Mr. Jenks's shoplifting on November 8 and the robbery on December 9. Before addressing Mr. Jenks's specific argument, we review the well-settled standards under which trial

---

[4] The defense arguably abandoned objection to the court's admission of the video, knowing that the court would limit how Mr. Jenks's actions could be described. And it certainly never mentioned the "modus operandi" requirement that it argues on appeal. But the State does not raise RAP 2.5(a) as an issue. While we may raise the rule sua sponte, we choose to address Mr. Jenks's challenge on the merits.

courts analyze the admissibility of evidence under ER 404(b) and under which their decisions are reviewed.

In order for a court to admit evidence of other wrongs, the court must: "(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect." *State v. Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002). Mr. Jenks does not contest that the trial court conducted the required steps of the analysis. Where the trial court correctly interprets ER 404(b), its ruling to admit or exclude evidence of misconduct is reviewed for abuse of discretion. *Id.*

As observed in *Thang*, evidence of bad acts may be "introduced to show identity *by* establishing a unique modus operandi." 145 Wn.2d at 643 (emphasis added). Here, however, a bad act was introduced to show identity not by demonstrating a modus operandi, but by establishing a strong similarity in physical appearance between the known perpetrator of one act and the partially disguised perpetrator of another. In none of the cases cited by Mr. Jenks was the State offering visual evidence and asking the jury to assess physical similarities between two perpetrators.

It will be the rare case, to be sure, where the State has one piece of visual evidence of an undisguised defendant committing a crime that it wishes to offer to prove that the disguised perpetrator of another crime appears to be the same individual. This case might

8

be a first. The far more common use of "bad acts" evidence for identification purposes is to show a common method of committing two crimes. Where that is the case, Washington decisions *do* insist, as Mr. Jenks argues, that proof of a unique modus operandi is required.

But this unusual case of visual evidence of a defendant to show his physical similarity to a disguised perpetrator is relevant evidence. While the quality of the videos is too poor to say with confidence that the same man is in both videos, they do show men of similar size, build, hair, gait, and clothing in the same location, filmed from the same vantage points, only a month apart. The November 8 video has a tendency to make the fact that Mr. Jenks is the robber in the December 9 video more probable than it would be without the evidence—the test of relevance under ER 401. It is offered for a purpose other than the purpose forbidden by ER 404(b) of showing that Mr. Jenks is a criminal type.

Mr. Jenks also argues that even if the November 8 video was relevant to the issue of identity, "[a]llowing the jury to see the eight-minute video of what was obviously a shoplift in progress . . . was extremely prejudicial." Br. of Appellant at 16. Having reviewed the video, we strongly disagree with the defense characterization. It is not obvious from the video that a shoplift is in progress.

Mr. Jenks is seen being somewhat circumspect as he takes two cases of beer from the cooler—but not to a degree that would lead a viewer to automatically infer that he is

9

shoplifting. He makes no effort to hide the 18-packs. He walks, not runs, out of the store. There is no indication of alarm from any other customer or store employee and no store employee follows him. At most, the video shows that he does not stop to pay. But since he appears in the video to interact with other customers who *do* approach and engage in transactions with the store clerk, one could infer that a companion paid for the beer.

Having reviewed the video, we find it understandable why Mr. Jenks's trial lawyer was most concerned that no one mention that a shoplifting had occurred. He declined a limiting instruction precisely because jurors who would not infer a shoplifting from the video might become suspicious if given a limiting instruction, explaining that "my goal . . . is to not have them conclude that he's committing a theft." RP at 27.

We find no abuse of discretion by the court in admitting the October 8 video subject to the limitations it imposed on what could be said about Mr. Jenks's actions.

## II.  *Confrontation Clause*

Mr. Jenks next argues that his rights under the confrontation clause of the United States Constitution were violated when Ms. Heath testified at trial to test results obtained by another crime lab employee. We stayed the appeal anticipating guidance from our Supreme Court in *Lui*, and it proves controlling.

In *Lui,* the defense objected to the testimony of the State's chief medical examiner to the cause of a murder victim's death being asphyxia by strangulation; the time it would

10

take to die in that manner; the timeframe of the death; the fact that no drugs, alcohol or nicotine were found in her system; the position of her body when found; and the odd manner in which she was dressed. *Lui*, 179 Wn.2d at 465. The chief medical examiner had not performed her autopsy nor performed or supervised the toxicology test. He relied for his testimony on photographs taken during the autopsy by an associate medical examiner, the notes she took of ambient and body temperatures, and a report prepared by employees of the state toxicology laboratory. He also made several statements that were taken from the associate medical examiner's autopsy report. *Id.*

The defense in *Lui* also objected to testimony to DNA testing results provided by the associate director and technical leader of an outside laboratory to which DNA samples had been sent. *Id.* at 466. The associate director did not personally participate in or observe the tests that generated electronic data on the samples but she did use the electronic data to create a DNA profile that she testified "reflected '[her] own interpretation and [her] own conclusions.'" *Id.* (quoting 12 RP at 1484, 1507) (alternation in original).

To resolve Lui's challenge, our Supreme Court analyzed three opinions of the United States Supreme Court dealing with the confrontation clause implications of laboratory analysis reports where the analyst who performed the test did not testify.[5] *Lui*,

---

[5] The Supreme Court analyzed Lui's challenge solely under the federal confrontation clause, concluding that "[n]either the constitutional text, the historical

179 Wn.2d at 472; *see Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527,

174 L. Ed. 2d 314 (2009); *Bullcoming v. New Mexico*, __ U.S. __, 131 S. Ct. 2705, 180

L. Ed. 2d 610 (2010); and *Williams v. Illinois*, __ U.S. __, 132 S. Ct. 2221, 183 L. Ed. 2d

89 (2012). A majority of the U.S. Supreme Court did not agree on a test for expert

witnesses in any of the three decisions, "making it very difficult for courts to effectively

follow." *Lui*, 179 Wn.2d at 478.[6] The court in *Lui* thus followed the *results* of the

---

treatment of the confrontation right, nor the current implications of adopting a broader
confrontation right support an independent reading of article I, section 22 [of the
Washington Constitution] in this case." *Lui*, 179 Wn.2d at 470.

[6] In *Melendez-Diaz*, 557 U.S. 305, a five justice majority of the Court determined
certificates identifying bags of powder as cocaine were functionally equivalent to
affidavits and therefore were testimonial for purposes of the confrontation clause. 557
U.S. at 311. Because the certificates were testimonial and the defendant was not afforded
the opportunity to cross-examine the affiant, admission of the certificates into evidence
violated the confrontation clause. *Id.*

In *Bullcoming*, 131 S. Ct. 2705, a five justice majority determined that a certificate
recording the defendant's blood alcohol level had an evidentiary purpose and was
sufficiently formal such that the confrontation clause was violated when the analyst who
performed the tests did not testify at trial. 131 S. Ct. at 2715-16. Importantly, the analyst
who performed the test and created the certificate was on unpaid leave; as a result, the
defense was not presented with the opportunity to cross-examine said analyst regarding
incompetence, evasiveness, or dishonesty. *Id.* at 2715.

In *Williams*, 132 S. Ct. 2221, the Court considered whether an expert witness may
use testimonial statements made by a nontestifying witness, if those testimonial
statements are not admitted into evidence. 132 S. Ct. at 2223. In *Williams*, the State
called an expert witness to testify that the DNA profile created by an outside laboratory
matched the DNA profile of the defendant created by the State's laboratory. *Id.* at 2227.
The Court, in a plurality opinion, found there was not a confrontation clause violation.
*Id.* at 2223. Four justices held that because the DNA profiles were not admitted to prove
the truth of the matter asserted, the testimony did not violate the confrontation clause. *Id.*
at 2228. Further, because the outside laboratory created the DNA profile prior to the

decisions and arrived at a test for expert witnesses "that does not conflict with Supreme Court precedent." *Id.* at 462.

The court reasoned in *Lui* that by its terms, the confrontation clause applies only to "witnesses" "against" the defendant. U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."). Experts "who make statements to the court" are witnesses for purposes of the confrontation clause. *Lui*, 179 Wn.2d at 481. An individual who prepares a statement similar to an affidavit is considered a witness. *Id.* at 481 (citing *Melendez-Diaz*, 557 U.S. at 311). Similarly, an individual who provides live testimony concerning the results of a test is a witness. *Id.* (citing *Bullcoming*, 131 S. Ct. at 2713).

The *Lui* court found that the word "against" "implies some adversarial element—some capacity to inculpate the defendant." *Lui*, 179 Wn.2d at 481. Reading the words "witness" and "against" together, "in the context of Supreme Court hints and the reasoned practices of other jurisdictions," the Supreme Court arrived at a "working rule":

> If the declarant makes a factual statement to the tribunal, then he or she is a witness. If the witness's statements help to identify or inculpate the defendant, then the witness is a "witness against" the defendant.

*Id.* at 482.

---

identification of a suspect, the laboratory report was not inherently inculpatory. *Id.* Justice Thomas provided the fifth vote for finding there was no confrontation clause violation, reasoning that the DNA profiles compiled by the analyst from the outside laboratory were not sufficiently formal such that they were testimonial in nature. *Id.* at 2260-61 (Thomas, J., concurring).

13

Applying this analysis to the chief medical examiner and DNA analyst whose testimony in *Lui* was challenged, the Supreme Court concluded that while the associate medical examiner may have been a witness "by virtue of recording the temperatures, thus creating factual information for later use by the court," she was not a witness "against" the defendant because the facts recorded did not inculpate him. *Id.* at 493. Instead, it was the chief medical examiner who, using his own professional knowledge and experience, applied the facts to come to a conclusion inculpating the defendant who was a "witness against" the defendant. *Id.* Similarly, because he arrived at his conclusions through autopsy photographs, the chief medical examiner's opinion testimony regarding the cause of death did not violate the confrontation clause. *Id.* at 494-95.

But the Supreme Court concluded that the trial court erred in allowing the chief medical examiner to report statements and information from the autopsy and toxicology reports. *Id.* Those reports and their inculpatory conclusions were prepared by nontestifying experts. For the chief medical examiner to repeat them violated the confrontation clause. *Id.*

As to the DNA evidence, the Supreme Court concluded that an expert who performs the tests that merely produce DNA profiles is not a witness "against" the defendant. *Id.* at 486-88. "[T]he only 'witness against' the defendant in the course of the DNA testing process is the final analyst who examines the machine-generated data,

14

creates a DNA profile, and makes a determination that the defendant's profile matches some other profile." *Id.* at 489. "[E]xperts may rely upon DNA profiles created by other laboratory analysts when concluding there is a DNA match without violating the confrontation clause." *Id.* at 483.

As with the DNA profiles in *Lui*, the DNA profiles here did not gain their inculpatory character until Ms. Heath testified to her conclusion that the wearer samples were a match with the reference sample, and to the odds of those matches in the general population. Mr. Jenks had the opportunity to cross-examine Ms. Heath. There was no confrontation clause violation.

### III. Ineffective Assistance of Counsel

Mr. Jenks next argues that he received ineffective assistance of counsel when his trial lawyer failed to object to opinion testimony by Detective Gilmore that Mr. Jenks, and not Mr. Jenks's brother, was the individual in the November 8 video and to similarities the detective observed between Mr. Jenks and the robber in the December 9 video. Mr. Jenks argues that his lawyer was also ineffective in failing to raise a confrontation clause objection to Ms. Heath's testimony.

"Washington applies the two-part *Strickland* test in determining whether a defendant had constitutionally sufficient representation." *State v. Tilton*, 149 Wn.2d 775, 783, 72 P.3d 735 (2003) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). A defendant must show both that he received deficient

representation and that he suffered some prejudice as a result. *State v. Mierz*, 127 Wn.2d 460, 471, 901 P.2d 286 (1995) (citing *Strickland*, 466 U.S. at 687-89). Deficient performance is determined using an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d 668, 705-06, 940 P.2d 1239 (1997). Prejudice will result if "'counsel's errors were so serious as to deprive the defendant of a fair trial.'" *Mierz*, 127 Wn.2d at 471 (quoting *Strickland*, 466 U.S. at 687). "This showing is made when there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different." *Id.*

Turning first to Detective Gilmore's testimony, Mr. Jenks argues that his trial lawyer should have objected when, having been asked what he did upon learning that the individual in the November 8 video was Mr. Jenks, the detective answered:

> [Detective Gilmore:] . . . I actually pulled—looked at photos, actually of Mr. Jenks and of Mr. Jenks' brother, because I knew he had a brother not too far away from him in age and stature, and such.
> And so I looked at those photos and the video from November 8th that showed Mr. Jenks in the store. I was looking at that; yeah, that appears to be right to me, it sure appears to be the same person in the video as in my photo of Mr. Jenks. It did not appear to be his brother; looks different than that.
> [Prosecutor:] Did you notice similarities between Mr. Jenks in the November 8th, 2008 video and the person who went into the store on December 9th, 2008 who was wearing a bandanna around his face?
> [Detective Gilmore:] Yes.
> [Prosecutor:] And what similarities did you take into account?
> [Detective Gilmore:] Well, initially the person in both videos appeared to be a person of short stature. He was listed in the computer as being 5'4/5'5. That is on the short end of adult males—and I guess would

16

be a lot smaller percentage of adult white males that are five-foot four, five-feet five. So the stature looked about the same on both.

I believe the pants and shoes looked the same on both.

And probably the most significant thing that was a unique—unique characteristic on both videos is the long ponytail. I'm sorry, I don't believe the ponytail was visible in the second video. The ponytail that was pretty unique was in the November 8th video, but I think it was tucked under the jacket, so I don't believe it was visible in the second one. I apologize.

But in the comparison of both, seeing both of these persons on the video and the movement in the store and the stature, and really everything about them that I could see, I thought this is the same person; that was my belief.

RP at 105-07.

Mr. Jenks argues that because Detective Gilmore's testimony did not require specialized knowledge or training, he was not testifying as an expert and that it was not established that Detective Gilmore had any more insight on the issue of identity than could be provided by the jurors.

In *State v. Hardy*, 76 Wn. App. 188, 190, 884 P.2d 8 (1994), the court held that "[a] lay witness may give an opinion concerning the identity of a person depicted in a surveillance photograph if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." *Id.* Applying the rule, the court concluded that a witness who "had known [the defendant] for several years" and had seen the defendant in motion, was in a better position to identify the defendant as the individual depicted in a grainy video than was the jury who only saw the defendant sitting still at the defense table. *Id.* at 191.

17

Absent a reason to believe that the witness has a superior ability to make the identification, it is an impermissible invasion of the province of the jury to admit such evidence. *State v. Jamison*, 93 Wn.2d 794, 613 P.2d 776 (1980) (juvenile detention counselors were in no better position to identify defendant from surveillance photographs than were jurors).

Testimony at trial established that Detective Gilmore was not familiar with Mr. Jenks before the beginning of the investigation. He did not meet Mr. Jenks until after Mr. Jenks cut his hair, so he was in no better position to identify Mr. Jenks in the December 9, 2008 video than the jury.

If one of the two prongs of the *Strickland* test is absent, we need not inquire further. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). And "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697. Here, it is clear that there is no reasonable possibility, let alone probability, that the trial outcome would have been different had Mr. Jenks's lawyer objected and successfully cut off the detective's testimony about his observations.

The detective never claimed to know more about Mr. Jenks's appearance in December 2009 than the jurors did and never claimed to have conducted a more expert or careful review of the video than could be performed by the jurors. So it would have been as obvious to the 12 jurors as it is to us that they were as capable as the detective of

determining whether the robber captured in the December 9 video was Mr. Jenks. The

jury was instructed, in part, that

> You are the sole judges of the credibility of each witness. You are
> also the sole judges of the value or weight to be given to the testimony of
> each witness. In considering a witness's testimony, you may consider . . .
> the opportunity of the witness to observe or know the things he or she
> testifies about.

Clerk's Papers at 22-23.

The detective's opinion that the person in the November 8 video looked like Mr.

Jenks rather than like Mr. Jenks's brother was even less consequential. The jury heard

from the detective that Mr. Jenks admitted to being in the convenience store on

November 8. Mr. Jenks did not contend otherwise. There was literally no evidence or

argument that it was Mr. Jenks's brother who had been captured in the November 8

video.

The jury was presented with far more important evidence that Mr. Jenks was the

robber in the form of the testimony of Mr. Denend, the results of the DNA testing of the

recovered sweatshirt, and the videotapes themselves. Mr. Jenks's trial lawyer may have

made the tactical choice not to interrupt the detective's explanation of the steps in his

investigation, knowing that the detective's opinion testimony was insignificant and

because the defense planned to emphasize part of that investigation itself: the facts that

Mr. Jenks voluntarily contacted the detective and agreed to be interviewed, and

voluntarily provided the buccal swab. Because no prejudice is shown, we need not further examine whether counsel's performance was tactical or deficient.

Finally, Mr. Jenks fails to demonstrate that his trial lawyer's failure to object to Ms. Heath's testimony on confrontation clause grounds was ineffective assistance of counsel. Ms. Heath's testimony did not violate the confrontation clause, as earlier discussed. An objection to her testimony on confrontation clause grounds would properly have been denied.

Mr. Jenks fails to demonstrate ineffective assistance of counsel.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Brown, J.

_____
Lawrence-Berrey, J.

20