IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37019-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOSEPH MARIO ZAMORA, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — After a 911 caller's dog barked at a person walking down the private road in front of her home, she reported that the person appeared to be looking into cars. Joseph Zamora turned out to be walking to the home of his niece. He proved to be high on drugs, however, and the State concedes that after police responded to the 911 call, a confrontation with Mr. Zamora "escalated far beyond what should have happened when a lone officer confronted a suspicious trespasser on a cold, icy winter night." Br. of Resp't at 32. Mr. Zamora's near death while resisting arrest resulted in an internal police investigation and prompts him to make some novel arguments on appeal.

We affirm the convictions but remand for resentencing.

FACTS AND PROCEDURAL BACKGROUND

On Super Bowl Sunday, February 5, 2017, Joseph Zamora, who was homeless at the time, spent time at the home of his brother, James Murphy. That evening, he decided

to walk to where his niece, Alyssa Murphy lived, a few blocks away. Mr. Zamora later admitted to smoking methamphetamine two or three days earlier, but he could not recall if he smoked any meth that day.

At around 9:30 p.m. that evening, then-Moses Lake Police Officer Kevin Hake[1] was on patrol when he received a report of a suspicious person carrying a suitcase and looking into vehicles on Space Street. The complaint had been phoned in by Brandi Moncada, who lived on Space Street and reported that an individual wearing "darkish clothes" and carrying some sort of bag was lurking around cars parked on the street. Report of Proceedings (RP) at 288. Because of the lack of street lighting, Ms. Moncada could not tell if the individual was male or female.

It had been snowing and road conditions were bad, but Officer Hake was only a quarter mile away, so he was able to respond quickly. When he arrived at Space Street he immediately saw what turned out to be Joseph Zamora, carrying some kind of case, walking down the road. Officer Hake and Mr. Zamora were traveling in the same direction, so the officer drove beyond him, pulled over, and got out of his patrol car. He signaled with his hand at Mr. Zamora, who was then about 20 feet away, and told Mr. Zamora he needed to speak with him. Mr. Zamora continued to walk toward Officer Hake and stopped when he reached him.

---

[1] Hake was no longer a police officer at the time of trial and was addressed at trial as "Mr. Hake." We refer to him as Officer Hake in recounting the events of February 5, 2017, but as Mr. Hake in recounting events at trial and thereafter.

Officer Hake did not have a body camera and his patrol car dash camera did not work. He would later testify that he proceeded to ask Mr. Zamora where he was going, where he was coming from, what his name was, and for identification, but Mr. Zamora would not answer. Instead, Mr. Zamora leaned in to read Officer Hake's name tag, stood back up straight, and stared at him. Officer Hake became nervous, sensing that something was not right. He claims Mr. Zamora had no expression in his eyes, which he described as "the size of silver dollars." RP at 321. Mr. Zamora appeared to be "looking through" Officer Hake. *Id.* Officer Hake noticed that Mr. Zamora's left hand was partially in his left pocket and that some of his fingers were holding a boot by pinching it against his body. He appeared to be "fiddling with something" with the fingers in his pocket, and Officer Hake thought he might have drugs he was trying to discard. RP at 322.

When Mr. Zamora stepped to his right as if to go around Officer Hake, the officer stuck out his arm and told Mr. Zamora he was not free to leave. He got on his radio and said, "I've got one resisting." RP at 323. Mr. Hake explained at trial that there had been a storm, the roads were icy, and he "wanted to get people coming to my location, because I knew it was going to take some time." RP at 324. Even though Mr. Zamora had done nothing threatening, Officer Hake was scared and felt "something was going to happen." RP at 324.

After Officer Hake told Mr. Zamora that deputies needed to speak to him because they had a report of someone looking through vehicle windows, Mr. Zamora turned, the boot fell from his grip, and the officer saw movement in Mr. Zamora's left arm. Officer Hake responded by grabbing at Mr. Zamora, hooking Mr. Zamora's arms at the elbows, and trying, unsuccessfully, to use his own leg to sweep Mr. Zamora's legs out from under him. Officer Hake describes that as being the moment "when the struggle started." RP at 326.

Blow by blow details of what turned out to be a lengthy struggle between Mr. Zamora, Officer Hake, and other officers are immaterial to the issues that Mr. Zamora raises on appeal. Suffice it to say the struggle was intense and unrelenting. Officer Hake, although taller and heavier than Mr. Zamora, realized that Mr. Zamora was stronger. Before other officers arrived, Officer Hake and Mr. Zamora exchanged dozens of blows and the officer eventually drew his handgun and placed it against Mr. Zamora's ear, temple, and in his mouth; over the radio, Officer Timothy Welsh heard Officer Hake say, "Put your hands behind your back, I'll fucking kill you." RP at 644. Officer Hake was prepared to shoot Mr. Zamora until he heard sirens, assuring him that help was coming.

The arrival of Officer Welsh was not enough to cause Mr. Zamora to quit resisting, and even two against one, the officers were unable to handcuff him. Officer Welsh tried to control Mr. Zamora's left arm, having observed that Officer Hake was

4

controlling Mr. Zamora's right side, but Mr. Zamora was able to "out-muscl[e]" him. RP at 628. It was only after four more officers arrived that they were able to handcuff Mr. Zamora. He continued kicking and flailing, so they used rope to hobble him; in the process of the officers trying hobble his legs, Mr. Zamora managed to kick Officer Welsh squarely in the chest. Officers then tied Mr. Zamora's hobbled feet to his handcuffs.

In the course of restraining Mr. Zamora, the officers collectively struck him repeatedly, pepper sprayed him in the face twice, and officers Welsh and Omar Ramirez used their stun guns to drive stun[2] him with five second bursts: Officer Ramirez drive stunned Mr. Zamora's upper body twice, while Officer Welsh drive stunned his lower body once. The officers contended the force was necessary, given Mr. Zamora's unremitting physical resistance and unnatural stamina and strength.

After Mr. Zamora was successfully restrained, he was moaning, and the officers summoned medical aid.

Responding emergency medical technicians (EMTs) determined on arriving that Mr. Zamora was not breathing and had no pulse. They immediately started CPR,[3] administered oxygen, gave him epinephrine, and administered two defibrillations. Once

---

[2] Officer Ramirez testified at trial that to perform a drive stun, probes are removed from the stun gun, it is placed in contact with the target's body, and when fired, it delivers a painful electrical arc. Officers Ramirez and Welsh testified that ordinarily a drive stun results in the target's immediate compliance. In Mr. Zamora's case, it appeared to have no effect.

[3] Cardiopulmonary resuscitation.

his heart started again, they transported him to the emergency room of Samaritan Hospital in Moses Lake, from which he was transferred to Sacred Heart Hospital in Spokane.

Before the transfer, Mr. Zamora was treated at Samaritan Hospital by Dr. Joshua Frank. Dr. Frank was told that Mr. Zamora had been very aggressive, erratic and exceedingly strong when resisting arrest. The doctor later testified that the most common cause of such behaviors would be that the individual was under the influence of a substance, usually a stimulant. A urine sample revealed that Mr. Zamora had methamphetamine, amphetamine, and THC[4] in his system. Mr. Zamora's sister visited him at Sacred Heart Hospital shortly after he was admitted and four weeks later, while he was still in the intensive care unit. Photographs she took of him were later admitted at trial.

When police searched Mr. Zamora's left jacket pocket following his arrest, they found a blue handled folding knife with the blade locked open.

It turned out that the house to which Mr. Zamora was walking was the home of the parents of his niece Alyssa's boyfriend, Crawford, who is the father of her child. Crawford's parents, the Torreses, live on Space Street. Alyssa had lived in their home for two years. Mr. Zamora's struggle with police took place in the Torreses' front yard.

---

[4] Tetrahydrocannabinol.

6

Crawford's father, Javier Torres, even watched the struggle from his living room window, not knowing that Alyssa's uncle was involved.

The investigation uncovered no evidence that anyone's car was broken into that night or that any property was stolen. It turned out that the "suitcase" Mr. Zamora was carrying was the case for a DJ Hero music video game. RP at 744.

*Internal investigation and pretrial motions in limine*

The State did not immediately charge Mr. Zamora. The lawyer appointed to represent him learned from interviewing the six Moses Lake police officers who responded to the incident that none had prepared a police report. An internal investigation had been commenced by the Moses Lake Police Department, apparently almost immediately. Responding officers were told by some unidentified person at a "higher level" that rather than prepare a report, they would be submitting to an interview. RP at 234. The officers' interviews were transcribed and produced to defense counsel, who discovered that they all included language, consistent with *Garrity v. New Jersey*, 385 U.S. 493, 499-500, 87 S. Ct. 616, 17 L. Ed. 2d 562 (1967), that the officers' statements could not be used against them in a criminal prosecution.[5] The internal investigation apparently found no wrongdoing by the officers.

---

[5] The statements are not included in the record on appeal, nor was the language that defense counsel contended made the statements "*Garrity* statements" read into the record. This is the implication of counsel's argument, however.

7

The separate investigation into whether Mr. Zamora should be charged was referred to Sergeant Matt Andersen of the Washington State Patrol, who spoke to Officer Hake briefly on the night of the incident. Defense counsel learned from officer interviews that none of them agreed to be interviewed by Sergeant Andersen; the sergeant relied instead on their *Garrity* statements. Sergeant Andersen did speak with other witnesses, including Mr. Zamora, and wrote a report in September 2017 that recommended that charges of assault in the third degree and disarming a law enforcement officer be filed against Mr. Zamora. In May 2018, Mr. Zamora was charged with two counts of third degree assault for his alleged assaults of Officer Hake and Officer Welsh.

Among pretrial motions in limine filed by the State was a motion to exclude evidence of a prior confrontation involving Mr. Hake. The State argued that while Mr. Zamora claimed self-defense, he could offer evidence of Mr. Hake's prior confrontation to prove reasonable apprehension only if he was aware of it on February 5, 2017.

Defense counsel did not oppose the motion. He told the court he was aware that Mr. Hake had been charged with "an assault four and a disorderly conduct by way of fighting words" that was subject to a stipulated order of continuance. RP at 12. He agreed with the State that "[f]or purposes of self-defense, it might be relevant if the defendant had known about that prior to this incident. But that is not my understanding, your Honor." RP at 12. The court granted the motion.

The State also asked the trial court to exclude any reference to the fact that the Moses Lake Police Department conducted an internal investigation. Its motion stated it had no objection to the use of statements made during the investigation in accordance with the rules of evidence, but asked the court to order that the statements be referred to as "statements recorded about the incident" or other similar language. Clerk's Papers (CP) at 164.

Defense counsel vigorously objected to any requirement that the officers' statements be referred to in a manner suggesting they were typical officer statements. He argued that he should be able to ask the officers

- if they made a *Garrity* statement as part of an investigation,
- whether they knew what a *Garrity* statement was,
- what their understanding was of the reason for making a *Garrity* statement,
- who told them to make a *Garrity* statement, and
- whether the officers made themselves available to interview by Sergeant Andersen for purposes of his investigation of the case against Mr. Zamora.

RP 401-02, 419-20. Defense counsel explained that "the use of an immunized statement that . . . can't be used to prosecute them is something that I would like the jury to know about." RP at 420.

The trial court heard extensive argument of the motion and ultimately granted it, explaining that asking the officers about whether their statement was a *Garrity* statement and the purpose of such a statement called for legal conclusions. It found that other

9

questions were not relevant and would cause jurors to speculate as to their relevance. Its

final concern was that the questions would introduce and waste time on a collateral issue.

*Voir dire*

The trial court allowed each side an hour for voir dire. The first topic the

prosecutor offered for discussion was border security:

> [PROSECUTOR:] So first of all, let's just take a general topic that seems to
> be in the media every day, and I'll ask you a general question, and that is
> some people say today in our society we have—we don't have enough
> border security. Some people say we have too much or we don't need that.
> So the question is which one do you feel like you're closer to? So I'm
> probably going to call on some people and just hear what you have to say
> about that.

RP at 71-72.

When one juror said she believed there are a lot of great people who come and

look for a better opportunity, that she believes in an opportunity for a lot of great people

to come into our country, and that a rock wall is ridiculous, the prosecutor said to her:

> Sorry for this, and I don't mean to get off on a jag, could you make room
> for the possibility that someone who—a loved one or family member of
> somebody who was either killed or had problems with somebody that's
> been previously deported or criminally is wrongly in the country, that that
> happens to them, and that they feel like we need more border security, can
> you make room for that?

RP at 75.

When a juror responded she locked her door to protect herself, but did not believe

in a border wall, the prosecutor said to her:

> Can you make room for the idea that when they hear that 100,000 people come across illegally a month, and of those we've got people from countries that—countries on our list that aren't even allowed in the country are part of that group?
>
> . . . .
>
> . . . That they feel that we've got a big problem and a porous border, meaning people are just coming across and we don't know who is here, that a lot of people have some fear about that.  Can you make room for that?

RP at 76-77.  The prosecutor then moved on to whether jurors locked their doors at night, whether they had been robbed before, and trespassing.  Its few mentions of immigration or the border thereafter were in the context of asking jurors whether they had views on any of the topics covered in its hour-long voir dire.

The next morning, outside the presence of the jury, the trial court asked defense counsel if he had a strategic reason for not objecting to the State's voir dire questioning about border security and illegal immigrants.  The court explained that it reviewed ER 413 and case law after the prior day's proceedings and had a concern that defense counsel's failure to object might be raised as an issue on appeal.  Defense counsel answered that he contemplated objecting.  He also observed that Mr. Zamora is not an immigrant.  He explained, however, "I'm not sure that that benefited the state.  That might have been to their detriment.  Which is why I didn't object.  I'm not sure that the jury will take those comments as beneficial to the state."  RP at 221.  Defense counsel

added that the State's questioning was "discussed back at the office,"[6] he planned to

address it in closing argument, and "I think that it might provide an advantage to me in

closing argument." RP at 221, 224.

After the trial court explained that it wanted to get defense counsel's thought

process on the record in the event of appeal, it asked the prosecutor if there was anything

he wanted to say. He responded:

> Well, I'd just say very briefly, your Honor, I guess I'm somewhat surprised
> by that. I didn't bring up the specific points that you talked about. I think
> the general question was I said some people—if the court recalls, some
> people, because this is a hot topic right now, some people feel that we need
> more border security, some people feel we don't. I wasn't suggesting
> anything about the defendant. I'm just curious about that.
> Because one of the situations we have is about security. In other
> words, the reason for the question is, from my end, was that, you know,
> following up with did they lock their doors, that kind of thing, because we
> have a situation, a vehicle prowl, that precipitated this whole event. And so
> I wanted to get their idea about how they—just generally how they felt
> about that.
> They brought up to me some points, I think, in response to things
> that the jurors were saying back to me in response to my general question,
> then I said a couple of things specifically. But I in no way intimated or was
> suggesting to the jury that the defendant is not a citizen of the country or is
> here illegally. That was not my intent at all. I was just simply responding
> to the questions I think they were asking me or our colloquy between us.

RP at 224-25. The prosecutor assured the court that the State would not intimate or

suggest that Mr. Zamora was an illegal immigrant or not a citizen.

---

[6] There had been a lunch break between the State's first and second rounds of voir
dire.

12

Shortly thereafter, defense counsel told the court that, with permission, it would raise his client's legal status in opening statement. The court said he could raise it in a nonargumentative way. During his opening statement, defense counsel said to the jury:

> [DEFENSE COUNSEL:] One of the things that I wanted to address right off the bat was yesterday in voir dire you were asked some questions, specifically about a border wall, cross border crime, immigrants coming in and committing crime, and I had a concern that that might put in your minds that there's an issue of immigration in this case. There is not. I don't want you to waste any more time thinking about that or wondering when you're going to hear evidence of that. My client is a U.S. citizen and so that is not at issue in this trial.

RP at 265.

*Trial*

At trial, the State called as witnesses Ms. Moncada (the 911 caller), Mr. Hake, Officer Welsh, three other responding officers, Dr. Frank, and Sergeant Andersen. The defense called as witnesses Mr. Zamora's sister, the EMTs who responded to the officers' call for medical assistance, and Javier Torres. Ms. Moncada, the law enforcement witnesses, and the medical professionals testified consistent with the facts set forth above.

Mr. Torres testified that he watched the struggle associated with Mr. Zamora's arrest from a window, but did not know it was Mr. Zamora who was being restrained. When asked what he saw, Mr. Torres testified he saw an officer "got the person, put their hands on the back and then threw to the floor." RP at 825-26. He did not see fighting between Mr. Zamora and Officer Welsh. When more officers showed up, Mr. Torres

13

testified officers were kicking, punching, and elbowing a man on the ground. Mr. Torres

did not see the man on the ground fight back, but did see the officers tie Mr. Zamora up

with rope.

When cross-examined, Mr. Torres affirmed that he never went outside to see if he

could help. The prosecutor then asked, "That's not a common occurrence for you, is it, to

have an officer and an individual involved in some kind of fight or something on the

ground in front of your home?" RP at 834. Mr. Torres answered, "Oh, if it's a cop, I

don't have nothing to do and nothing to say." RP at 834.

During closing, the State argued:

> There was a witness that came in for defense, Javier Torres, that said
> that officers were kicking at him, that the defendant was just on the ground,
> that he'd think he said his hands were behind his back, just being very
> compliant, that officers were just, you know, they're all just kicking at him.
> That's not what the evidence supports.
> And if you think about—if you remember what Javier Torres said,
> the exact quote, when talking about police, Javier stated, "If it's a cop, I
> don't have nothing to do and nothing to say." This is a guy who doesn't
> like the police. He—you know, when Officer Hake is out there struggling
> with the guy, he just stays inside, closes his door, doesn't offer any help.
> Then obviously, you know, for someone to come into court and say that on
> the stand, "I don't want nothing to do with police, I got nothing to say to
> them," he doesn't like law enforcement.

RP at 902-03. Defense counsel did not object.

The jury deliberated for almost two full days before returning its verdict. During

its deliberations, it asked for definitions for "excessive force" and "necessary force."

CP at 243. "Excessive force" was a term used in their instructions.[7] "Necessary force"

was the term the State had used in closing to describe the force it argued was justifiably

used against Mr. Zamora. The trial court expressed a concern that it was too late to

provide a definition, because the parties would have no opportunity to argue its

application. Counsel for the parties agreed no definition should be given. The trial court

responded by telling the jury it had received all of the court's instructions.

On the afternoon of the third day of deliberations, Mr. Zamora was found guilty as

charged. He was sentenced based on an agreed offender score of 7. He appeals.

ANALYSIS

Mr. Zamora makes seven assignments of error in his opening brief. We granted

permission for him to file a supplemental brief to address an issue raised by the

Washington Supreme Court's recent decision in *State v. Blake*, 197 Wn.2d 170, 481 P.3d

---

[7] Jury instruction 11 said:

> It is a defense to a charge of assault in the third degree that force used was lawful as defined in this instruction.
> A person may use force to resist an arrest or detention only if the person being arrested or detained is in actual and imminent danger of serious injury from an officer's use of *excessive force*. The person may employ such force and means as a reasonably prudent person would use under the same or similar circumstances.
> The State has the burden of proving beyond a reasonable doubt that the force used by the defendant was not lawful. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty as to count one, count two, or both.

CP at 217, 237 (emphasis added).

15

521 (2021). He contends (1) he received ineffective assistance of counsel in light of three prejudicial errors of his trial lawyer, (2) the trial court erred in ruling he could not cross-examine officers with his proposed *Garrity* questions, (3) the State's evidence negating self-defense was insufficient, (4) the prosecutor committed misconduct during voir dire and closing argument, and (5) his offender score was miscalculated in two respects: by failing to recognize that two of his prior convictions had washed out, and because he has two convictions for unlawful possession of a controlled substance that must be vacated in light of *Blake*. We review the challenges in the order stated.

I.      INEFFECTIVE ASSISTANCE OF COUNSEL IS NOT SHOWN

Mr. Zamora contends he received ineffective assistance of counsel in light of three prejudicial errors: his trial lawyer (1) failed to move to suppress evidence of his assaultive behavior, (2) failed to object to the exclusion of Mr. Hake's prior conduct charged as fourth degree assault and disorderly conduct, and (3) failed to request a jury instruction defining excessive force.[8]

To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness, and counsel's deficient representation prejudiced

---

[8] Mr. Zamora also makes a passing reference to his trial lawyer being ineffective for failing to object to the prosecutor's statements during voir dire and closing argument. He does not provide argument in support of this alleged ineffective assistance, however, so the passing reference will not be addressed. *See* RAP 10.3(a)(6).

the defendant, i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). If a defendant fails to establish one prong, we need not consider the other. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

In order for the court to find deficient performance, the defendant must establish "'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment [to the United States Constitution].'" *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011) (quoting *State v. Thomas*, 109 Wn.2d 222, 225, 743 P.2d 816 (1987)). "The threshold for the deficient performance prong is high" and there is "'a strong presumption that counsel's performance was reasonable.'" *Id.* at 33 (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). "When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." *Kyllo*, 166 Wn.2d at 863.

*Failure to move to suppress evidence of assaultive behavior*

Mr. Zamora first contends that his trial lawyer should have moved to suppress evidence of his assaultive conduct on grounds that when Officer Hake held out his arm and told Mr. Zamora he was not free to leave, it was a seizure unsupported by a reasonable suspicion that Mr. Zamora was, or was about to be, engaged in a crime. The

State argues in response that even if the seizure was unlawful, exclusion of evidence of Mr. Zamora's alleged assault was not an available remedy.

Mr. Zamora replies that exclusion of evidence *was* an available remedy, relying on *State v. Cormier*, 100 Wn. App. 457, 462-63, 997 P.2d 950 (2000).  Br. of Appellant at 32.[9]  But *Cormier* does not hold that if an individual is unlawfully searched or seized then evidence of his responsive assault is inadmissible.  It states the opposite.  It cites *State v. Mierz*, 127 Wn.2d 460, 901 P.2d 286 (1995), for the proposition that evidence of a defendant's assaultive behavior is properly admitted regardless of any alleged Fourth Amendment violation.  *Id.* at 473.  Other case law is in accord.  "When an individual assaults a police officer whose intrusion allegedly violates Fourth Amendment protections, evidence of the assault is outside the scope of the exclusionary rule."  *State v. McKinlay*, 87 Wn. App. 394, 398, 942 P.2d 999 (1997) (citing *Mierz*, 127 Wn.2d at 471-75).  "A contrary rule would allow one who was subject to an illegal search [or seizure] to respond with unlimited force and be immunized from prosecution."  *Id.* (citing *State v. Aydelotte*, 35 Wn. App. 125, 132, 665 P.2d 443 (1983)).

---

[9] Mr. Zamora also cites *State v. Valentine*, 132 Wn.2d 1, 21, 935 P.2d 1294 (1997), *State v. Westlund*, 13 Wn. App. 460, 467, 536 P.2d 20 (1975), and *State v. Bradley*, 141 Wn.2d 731, 10 P.3d 358 (2000), for support.  None of those decisions deals with suppression motions or exclusion of evidence of assaultive behavior.  All are prosecutions for assault of a police or corrections officer in which self-defense was asserted as a defense, but they address other issues.  Clearly, since the jury in each of those cases was hearing prosecution of the assault, defense counsel either never moved to suppress evidence of the assault or, if it did, it lost the motion and did not challenge denial of the motion on appeal.

A motion to suppress evidence of Mr. Zamora's assaultive conduct was legally

insupportable even if the seizure was unlawful. Deficient representation is not shown.

*Mr. Hake's prior assault and disorderly conduct charges*

Mr. Zamora next contends his trial lawyer was ineffective because he failed to

oppose the State's request that the court exclude evidence of the assault and disorderly

conduct charges against Mr. Hake that were the subject of a stipulated continuance for

dismissal. He argues the State presented evidence of Mr. Hake's work experience and

training that it later relied on in arguing that the officer was able to exercise "amazing

restraint" when his contact with Mr. Zamora resulted in a violent struggle. RP at 890.

Likening this evidence and argument to that involved in *State v. York*, 28 Wn. App. 33,

621 P.2d 784 (1980), Mr. Zamora argues that his lawyer could and should have

impeached Mr. Hake with his prior violent conduct.

*York* involved ER 608(b), and the ability to cross-examine a witness about specific

instances of conduct that are probative of truthfulness or untruthfulness. In *York*, the

State's prosecution of two counts of delivery of a controlled substance relied on the

testimony of an undercover investigator—its only witness to the sales—who had been

paid $20 per successful drug buy. *Id.* at 34-35. On direct examination, the private

investigator testified to his long work history including his background as a military

policeman investigating drug usage and his previous work for the police department as an

undercover agent. *Id.* at 34. The defense sought to cross-examine him about being fired

19

from a trainee position with a Montana sheriff's department. *Id.* at 35. It sought to establish that he was unemployed and not above fabricating or otherwise adjusting his testimony about drug buys in order to obtain money. *Id.* The State moved to exclude evidence of the investigator's adverse work history and the court granted the motion, finding it was a collateral matter. *Id.* at 34. In closing argument, the prosecutor told jurors there was "no reason at all to doubt" the investigator's testimony. *Id.* at 35.

York had called a number of alibi witnesses who testified that he was not present at the location where the alleged drug buy occurred, so this court observed that the undercover investigator's credibility "was not, therefore, collateral; it was the very essence of the defense." *Id.* at 36. That being the case, "as a matter of fundamental fairness, the defense should have been allowed to bring out the only negative characteristics of the one most important witness against York. . . . [W]e find this area of impeachment to be of considerable importance to the defense and cannot in good conscience condone the trial court's action." *Id.* at 37.

Mr. Zamora fails to articulate how the fact that Mr. Hake engaged in conduct charged as fourth degree assault and disorderly conduct would be "probative of . . . untruthfulness" and thereby a permissible area of questioning under ER 608(b). *See United States v. Page*, 808 F.2d 723, 730 (10th Cir. 1987) (acts admissible under Federal Rule of Evidence 608(b) generally include "forgery, uttering forged instruments, bribery, suppression of evidence, false pretenses, cheating, [and] embezzlement") (alteration in

20

original).[10]  Charges of fourth degree assault and disorderly conduct imply aggressive conduct, not untruthful conduct.  Evidence of Mr. Hake's stipulation to fourth degree assault and disorderly conduct was more likely to suggest a propensity for aggression in order to show action in conformity therewith—a purpose for which the evidence would be inadmissible under ER 404(b).

This court observed in *York* that it would not have reversed the conviction if the undercover investigator's prior employment troubles "had no substantial bearing upon the witness' credibility."  28 Wn. App. at 37.  Mr. Zamora does not demonstrate that his trial lawyer could plausibly have argued that Mr. Hake's acts of criminal aggression were a permissible subject matter of questioning under ER 608(b) and *York.*  Deficient representation is not shown.

*Jury instruction defining "excessive force"*

Mr. Zamora next contends that his trial lawyer's failure to request a jury instruction defining "excessive force" was prejudicial and deficient representation.  He does not argue that his lawyer should have advocated for giving such an instruction during jury deliberations.  He contends, instead, that his trial lawyer should have made an earlier, timely request for such an instruction.

---

[10] "Where our evidence rules mirror their federal counterparts, we may look to federal case law interpreting the federal rules as persuasive authority in interpreting our own rules."  *In re Det. of Pouncy*, 168 Wn.2d 382, 392 n.9, 229 P.3d 678 (2010).

For cases involving third degree assault of a police officer, there is no pattern criminal instruction on excessive force that accompanies WPIC[11] 17.02.01, the self-defense instruction that refers to excessive force.  Mr. Zamora suggests that his trial lawyer could have proposed the pattern instruction used in civil cases involving an unreasonable force claim under the Fourth Amendment.[12]

---

[11] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL (4th ed. 2016) (WPIC).

[12] The instruction, which appears at 6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL § 342.03 (7th ed. 2019) (WPI), states:

> A seizure of a person is unreasonable under the Fourth Amendment if [a police officer] [(name of other person acting under color of state law)] uses excessive force [in making a lawful arrest] [and] [or] in defending [himself] [herself] [others]].  Thus, in order to prove an unreasonable seizure in this case, the plaintiff must prove by a preponderance of the evidence that the officer[s] used excessive force when (insert factual basis of the claim).
>
> Under the Fourth Amendment, a police officer may only use such force as is objectively reasonable under all of the circumstances.  In other words, you must judge the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene and not with the 20/20 vision of hindsight.
>
> In determining whether (name of officer(s)) used excessive force in this case consider all of the circumstances known to the officer[s] on the scene [including but not limited to:
>
> a) severity of the crime;
>
> b) circumstances to which the officer was responding;
>
> c) whether (name of plaintiff) reasonably appeared to pose an immediate threat to [name of defendant] or others;
>
> d) whether (name of plaintiff) actively resisted [arrest] [detention];

What is missing from this argument on appeal is *why* it was defective representation not to request the civil instruction. Mr. Zamora implies that a definition was necessary for him to argue his theory of the case, but that is not so. "'Trial courts must define technical words and expressions used in jury instructions, but need not define words and expressions that are of ordinary understanding or self-explanatory.'" *In re Det. of Pouncy*, 168 Wn.2d 382, 390, 229 P.3d 678 (2010) (quoting *State v. Brown*, 132 Wn.2d 529, 611-12, 940 P.2d 546 (1997)). Mr. Zamora does not identify any argument that his trial lawyer was unable to make because the jury did not have a definition of excessive force.

A tactical reason for not requesting an instruction on excessive force is that it would deflect the jury's attention from what trial counsel treated as the more defense-friendly focus of the court's instructions: whether the State proved beyond a reasonable doubt that *the force used by Mr. Zamora* was not lawful. Defense counsel was able to

---

e) whether (name of plaintiff) attempted to evade [arrest] [detention];

f) the amount of time available to (name of defendant) at the time [he][she] made the decision to use force, and what type and degree of force was necessary;

g) whether there was a change of circumstances during which (name of defendant) had to make a decision about the type and amount of force that appeared to be necessary;

h) whether alternative methods of using force for [arrest] [detention] were available to (name of defendant) at that time; and

i) whether the officer issued a warning to the suspect if feasible].

23

argue that the physical struggle was started by Officer Hake. He was able to argue that Mr. Zamora had no pepper spray, no stun gun, and no handgun to use against six officers. He was able to argue that none of the officers' hearts stopped and that none of them was hospitalized, in intensive care, four weeks after the encounter.

Mr. Zamora's argument on appeal boils down to the fact that the jury turned out to want a definition of excessive force. But "'[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Grier*, 171 Wn.2d at 34 (alteration in original) (quoting *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Here again, deficient representation is not shown.

II.     THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING EVIDENCE THAT
        THE OFFICERS INVOLVED PROVIDED *GARRITY* STATEMENTS

Mr. Zamora contends the trial court abused its discretion and deprived him of his right to present a defense when it excluded evidence that the responding officers who testified had provided *Garrity* statements.

Both the federal and state constitutions protect the rights of criminal defendants to present a complete defense and to confront adverse witnesses. *State v. Orn*, 197 Wn.2d 343, 482 P.3d 913, 917 (2021); U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. "'The primary and most important component' of the confrontation right 'is the right to

24

conduct a meaningful cross-examination of adverse witnesses.'" *Orn*, 197 Wn.2d at 347

(quoting *State v. Darden*, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002)).

Meaningful cross-examination does not mean unlimited cross-examination.

*Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986);

*State v. Romero-Ochoa*, 193 Wn.2d 341, 348, 440 P.3d 994 (2019), *cert. denied*, 141 S.

Ct. 398 (2020). A trial court has wide latitude to place reasonable limits on cross-

examination based on concerns about prejudice, confusion of the issues, undue delay or

waste of time, and marginal relevance. *Van Arsdall*, 475 U.S. at 679; *see also State v.*

*Lee*, 188 Wn.2d 473, 487, 396 P.3d 316 (2017).

We review de novo whether the trial court's evidentiary rulings abridged a

defendant's Sixth Amendment rights. *Orn*, 197 Wn.2d at 350. We review the exclusion

of evidence under the evidentiary rules for abuse of discretion. *Id.* at 351.

We apply a three-part test to determine whether a trial court violated a defendant's

right to confront a witness by limiting the scope of cross-examination:

> First, the evidence must be of at least minimal relevance. Second, if
> relevant, the burden is on the State to show the evidence is so prejudicial as
> to disrupt the fairness of the fact-finding process at trial. Finally, the
> State's interest to exclude prejudicial evidence must be balanced against the
> defendant's need for the information sought, and only if the State's interest
> outweighs the defendant's need can otherwise relevant information be
> withheld.

*Lee*, 188 Wn.2d at 488 (quoting *Darden*, 145 Wn.2d at 622).

In arguing that the trial court violated his rights by limiting cross-examination, Mr. Zamora devotes most of his analysis to the second and third steps of the test rather than the crucial threshold issue of minimal relevance. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401.

Evidence that impeaches or discredits a witness is relevant. *Lee*, 188 Wn.2d at 488. Mr. Zamora asserts that the fact that the officers provided *Garrity* statements detracts from their credibility, but he never explains why that would be the case. His argument is all conclusory. *See* Br. of Appellant at 43-44 ("factors surrounding making a *Garrity* statement went directly to [the officers'] mental state, credibility, and colored the entire investigation"; "[b]ecause each officer participated in the *Garrity* statements to preserve their employment, and their credibility was at issue . . . [the evidence] should have been allowed"; "Whether officers had been warned they had to make a statement or lose their job, and the statements could not be used to prosecute them bore directly on their credibility").

In arguing for his right to cross-examine, Mr. Zamora's trial lawyer explained his understanding of the context and consequences of providing a *Garrity* statement:

> [DEFENSE COUNSEL]: A Garrity statement, your Honor, is a
> statement that's made with a warning that is similar to a Miranda warning,
> with the exception that it has an added clause that nothing in the statement

can be used to prosecute the person making that statement unless they lie in the statement.

. . . .

. . . [T]he Garrity warning includes that the statements being made under immunity from prosecution, basically use immunity, that they are required to make the statement for purposes of the investigation into their conduct, but that unless they commit perjury or they lie in the statement, that it can't be used for any other conviction purposes, your Honor.

THE COURT: For any criminal purposes?

[DEFENSE COUNSEL]: Yes. Except for I believe it's specific to perjury. I think it does still allow for convictions for perjury.

RP at 402-04.

If Mr. Zamora established in cross-examination that the officers provided statements about the incident knowing they would not face prosecution for any wrongdoing reported, but only if they perjured themselves, it would not discredit or impeach their testimony. It would arguably enhance it. Because Mr. Zamora was unable to demonstrate that his proposed examination was minimally relevant, the trial court did not err or abuse its discretion in imposing the limitation.

III. EVIDENCE SUFFICIENCY

Mr. Zamora next contends that the State's evidence was insufficient to disprove self-defense. Evidence is sufficient if, when viewed in the light most favorable to the State, it permits a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980), *overruled on other grounds by Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d

27

466 (2006). Courts must draw all reasonable inferences from the evidence in favor of the State and interpret the evidence most strongly against the defendant. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Appellate courts defer to the fact finder on the resolution of conflicting testimony, credibility determinations, and the persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

Mr. Zamora asserts that once Officer Hake grabbed him by the elbows and said, "Put your hands behind your back, I'll fucking kill you," any citizen in that situation would fear being seriously harmed. To begin with, the evidence was not that those events happened simultaneously.

More importantly, the arrestee's fear must be of actual, imminent danger if he does *not* resist, not actual, imminent danger if he *does* resist. Jurors could reasonably find that Mr. Zamora did not face actual, imminent danger if he put his hands behind his back, allowed himself to be handcuffed, and awaited the arrival of the deputies Officer Hake told Mr. Zamora wanted to question him. "[T]he established rule for use of force in self-defense cases involving arrests requires the person face a situation of actual, imminent danger." *State v. Bradley*, 141 Wn.2d 731, 738, 10 P.3d 358 (2000). "Orderly and safe law enforcement demands that an arrestee not resist a lawful arrest . . . unless the arrestee is actually about to be seriously injured or killed." *State v. Holeman*, 103 Wn.2d 426, 430, 693 P.2d 89 (1985) (quoting *State v. Westlund*, 13 Wn. App. 460, 467, 536 P.2d 20 (1975)).

Viewing the evidence in the light most favorable to the State, reasonable jurors could find that Officer Hake's initial use of force was based on a reasonable fear that Mr. Zamora was reaching for a weapon, was not excessive, and did not actually put Mr. Zamora's life in imminent danger.

The evidence is also sufficient to support the conviction for assaulting Officer Welsh. A jury could reasonably find that Officer Welsh was merely attempting to restrain Mr. Zamora in order to effectuate what had become a valid arrest when Mr. Zamora kicked him in the chest.

IV.     PROSECUTORIAL MISCONDUCT

Mr. Zamora contends for the first time on appeal that the prosecutor committed misconduct in voir dire and in closing statement. The misconduct alleged to have occurred in voir dire was the prosecutor's irrelevant and allegedly inflammatory discussion of issues of illegal immigration, border security, and juror fear of undocumented immigrants. The misconduct alleged in closing argument is that the prosecutor discounted the testimony of Javier Torres as someone who does not like law enforcement, an argument Mr. Zamora contends was calculated to invite the jury to "slip comfortably into an unconscious bias." Br. of Appellant at 55.

Prosecutorial misconduct is not attorney misconduct in the sense of violating rules of professional conduct. *State v. Fisher*, 165 Wn.2d 727, 740 n.1, 202 P.3d 937 (2009). It is, instead, a term of art that refers to "prosecutorial mistakes or actions [that] are not

29

harmless and deny a defendant [a] fair trial." *Id.* To succeed on a prosecutorial

misconduct claim, an appellant has the burden of establishing that the prosecutor's

conduct was improper (as being at least mistaken) and was prejudicial. *State v. Stenson*,

132 Wn.2d 668, 718-19, 940 P.2d 1239 (1997). A defendant demonstrates prejudice by

proving there is a "'substantial likelihood the . . . misconduct affected the jury's

verdict.'" *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 481-82, 965 P.2d 593 (1998)

(quoting *State v. Pirtle*, 127 Wn.2d 628, 672, 904 P.2d 245 (1995)).

Where, as here, there was no timely objection, reversal is required only if the

conduct is "'so flagrant and ill-intentioned that it causes an enduring and resulting

prejudice that could not have been neutralized by a curative instruction to the jury.'"

*State v. Warren*, 165 Wn.2d 17, 43, 195 P.3d 940 (2008) (quoting *Brown*, 132 Wn.2d at

561). "This standard sets a much higher bar for reversal than the 'improper and

prejudicial' standard we employ when a defendant timely objects." *State v. Loughbom*,

196 Wn.2d 64, 74, 470 P.3d 499 (2020). As such, our Supreme Court has only

sanctioned reversing convictions based on flagrant and ill intentioned misconduct "'in a

narrow set of cases where we were concerned about the jury drawing improper inferences

from the evidence.'" *Id.* (quoting *In re Pers. Restraint of Phelps*, 190 Wn.2d 155, 170,

410 P.3d 1142 (2018)).

Mr. Zamora characterizes the prosecutor's conduct as attempting to appeal to

racial stereotypes and jurors' potential racial bias, a Sixth Amendment violation that our

Supreme Court had held requires the State to demonstrate beyond a reasonable doubt "'did not affect the verdict.'" *In re Pers. Restraint of Sandoval*, 189 Wn.2d 811, 833-34, 408 P.3d 675 (2018) (quoting *State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011)); U.S. CONST. amend. VI. But "this heightened standard does not apply every time a prosecutor mentions race." *Id.* at 834. Instead, the heightened standard applies "only when a prosecutor mentions race in an effort to appeal to a juror's potential racial bias, i.e., to support assertions based on stereotypes rather than evidence." *Id.*

*Closing argument*

We first address the prosecutor's statements about Javier Torres in closing argument. Mr. Zamora argues that when the prosecutor argued that jurors should discount Mr. Torres's testimony because he apparently does not like police, he committed the "sin of *Monday.*" Br. of Appellant at 55. In *Monday*, the prosecutor argued a theme that "black folk don't testify against black folk." 171 Wn.2d at 674.

The prosecutor in this case did not mention Mr. Torres's race nor did he rely on racial stereotyping to argue that Mr. Torres would be biased against police. He relied on Mr. Torres's testimony. Recall that when Mr. Torres was asked if it was not true that officers and individuals did not commonly get involved in fights in front of his home, he answered, "Oh, if it's a cop, I don't have nothing to do and nothing to say." RP at 834.

Mr. Torres was the only eyewitness to Mr. Zamora's struggle with officers whose testimony was favorable to Mr. Zamora. Whatever Mr. Torres's race, the prosecutor

31

would naturally point to any evidence suggesting Mr. Torres had a bias against police. The argument was not about Latinos, it was specific to Mr. Torres. When a prosecutor makes a logical argument that jurors should discount unhelpful testimony from a witness, the fact that the witness is a person of color does not, standing alone, make the argument racist.

*Voir dire*

Mr. Zamora's unpreserved complaint about voir dire implicates several legal concerns. It triggered the trial court's concern because of ER 413, adopted in 2018, which imposes strict limits on the admissibility of evidence of the immigration status of parties and witnesses in light of "the prejudicial nature of evidence of immigration status." ER 413(a)(4). While the rule does not apply to the conduct of voir dire, it reflects a recognition that jurors can have strongly held biases about persons who are in the country illegally that should not play any part in a defendant's criminal trial.

It raises the concern that a defendant's criminal responsibility must be decided on the basis of the evidence against him, not on the basis of fear about a class of persons to which he belongs (or in this case, might be perceived to belong). *Cf. State v. Belgarde*, 110 Wn.2d 504, 508, 755 P.2d 174 (1988) (prosecutor should not have argued in closing the danger presented by the American Indian Movement "which the jurors ha[d] no right to consider"), *aff'd*, 118 Wn.2d 1021, 826 P.2d 147 (1992). In a case in which our

Supreme Court recently reversed a conviction that had been encouraged throughout trial

as a step in the "war on drugs," the high court explained:

> Justice can be secured only when a conviction is based on specific evidence
> in an individual case and not on rhetoric.  We do not convict to make an
> example of the accused, we do not convict by appeal to a popular cause,
> and we do not convict by tying a prosecution to a global campaign against
> illegal drugs.

*Loughbom*, 196 Wn.2d at 69-70.

The prosecutor's references to border security and immigration were limited to

voir dire, the purpose of which is to "discover[ ] any basis for challenge for cause and for

the purpose of gaining knowledge to enable an intelligent exercise of peremptory

challenges."  CrR 6.4(b).  The prosecutor's exploration of the prospective jurors'

attitudes about locked doors and neighborhood safety was understandable.  This was a

case in which a citizen's mistaken report of vehicle prowling almost resulted in the death

of an individual who, until seized by a police officer, was guilty of nothing more than

walking while high on drugs.  Both sides would be interested in knowing whether venire

members were vigilant, hypervigilant, or relatively unconcerned about crime in their

neighborhoods.

Adding border security and illegal immigration as a layer to the questioning was

irrelevant and unnecessarily politicized it.  But defense counsel could have asked for a

sidebar and objected, and the trial court would have been well within its authority to

instruct the prosecutor that the topics were off-limits.  Our system vests a trial judge with

considerable latitude in shaping the limits and extent of voir dire. *Lopez-Stayer v. Pitts*, 122 Wn. App. 45, 50, 93 P.3d 904 (2004). Such a limitation would have been consistent with the reasoning behind ER 413.

Mr. Zamora's lawyer was in a superior position to assess whether the voir dire was harming the defense. It is evident from the report of proceedings that a number of jurors had no anti-immigrant bias and spoke up; defense counsel had the opportunity to observe other jurors and assess their reaction. The questions, responses, facial expressions and body language could inform his challenges and juror selection. Having steered clear of any controversy himself, he then used his opening statement to nullify any improper relevance that jurors might have attached. His firsthand conclusion, vetted with others at his office, was that "I'm not sure that [the voir dire] benefitted the state. That might have been to their detriment." RP at 221.

Mr. Zamora is unable to demonstrate that the prosecutor's conduct caused an enduring and resulting prejudice that could not have been neutralized.

V.    OFFENDER SCORE

In his opening brief, Mr. Zamora challenged his offender score on the basis of convictions he contended should have washed out. The State contended that Mr. Zamora's allegation of error was not supported by the record. But it also reported that in a CrR 7.8 motion that had been withdrawn, Mr. Zamora had identified a different legal error in his offender score. It did not object to resentencing.

Following the recent decision in *Blake*, Mr. Zamora filed a motion with this court for additional relief, arguing that he had two prior convictions for unlawful possession of a controlled substance that must be vacated, resulting in a two-point reduction in his offender score. While the State does not agree that this panel can provide all of the relief requested by Mr. Zamora's motion, it continues to support resentencing.

We agree that resentencing is required.

STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds (SAG) Mr. Zamora raises seven: (1) Washington State Patrol Sergeant Matt Andersen sat next to the prosecutor for the entire trial and twice reached for his gun; (2) public defender Tyson Lang is friends with Kevin Hake, giving rise to a conflict of interest; (3) Sergeant Andersen led Mr. Zamora to believe he was investigating the officers involved, which led to Mr. Zamora giving Sergeant Andersen his medical report; (4) Mr. Zamora has only one juvenile felony that the State counted as two, over Mr. Zamora's objection; (5) if Officer Hake had asked or said he was going to search Mr. Zamora for self-protection, Mr. Zamora would have let him do it; (6) the mistake made in calculation of Mr. Zamora's offender score in this case is the same mistake made in Grant County Superior Court case no. 14-1-00428-4; and (7) the State was allowed to lie to the jury about Mr. Hake.

The offender score issues identified as Mr. Zamora's fourth and sixth grounds can be argued at resentencing. As for his first ground, Sergeant Andersen was the State's ER

35

No. 37019-4-III
*State v. Zamora*

615 representative at trial and was entitled to sit at counsel table. Mr. Zamora's opportunity to present the evidence advanced in his fifth ground was at trial; he identifies no basis on which his failure to present that evidence provides a basis for appeal. His remaining grounds are not supported by evidence in the record. If he has evidence to support them and a legal basis on which he believes they entitle him to relief, his remedy is to seek relief by personal restraint petition. *State v. Norman*, 61 Wn. App. 16, 27-28, 808 P.2d 1159 (1991).

We affirm the convictions and remand for resentencing.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____        _____
Lawrence-Berrey, J.                              Pennell, C.J.

36